**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **DANA CARDEN, INDIVIDUALLY AND FOR A CLASS OF SIMILARLY SITUATED PERSONS OR ENTITIES,** | ) ) ) ) |
| **Plaintiffs;** | ) **CIVIL ACTION NO.:** |
| **v.** | ) ) **2:15-cv-01381-RDP** |
| **THE TOWN OF HARPERSVILLE; JUDICIAL CORRECTION SERVICES, INC. a corporation; CORRECTIONAL HEALTHCARE COMPANIES, INC., a corporation; CHC COMPANIES, INC., a corporation.** | ) ) ) ) ) ) |
| **Defendants.** | ) ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
THE TOWN OF HARPERSVILLE'S
MOTION TO DISMISS AMENDED COMPLAINT**

G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
Attorneys for The Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209

William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209

**TABLE OF CONTENTS**

I.     PLAINTIFF ALLEGES PERSONAL FACTS THAT SUPPORT HER CLAIMS.. . . . . . 2

II.    THE COMPLAINT PROPERLY ALLEGES UNCONSTITUTIONAL POLICIES AND PRACTICES OF THE CITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.     The Complaint Alleges That the Mayor And City Council Are City Policymakers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.     The City Judge and City Magistrate are not "State Officials.". . . . . . . . . . . . . . 7

III.   THE CITY OF HARPERSVILLE IS LIABLE FOR ITS POLICY AND PRACTICE INVOLVING ITS MUNICIPAL COURT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.    THE CITY'S UNCONSTITUTIONAL POLICIES ARE SHOWN BY ITS CONTRACT WITH JCS - NOT DEPENDENT ON IT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.     PLAINTIFF'S RICO CLAIMS AGAINST THE CITY ARE VIABLE. . . . . . . . . . . . . 20

VI.    PLAINTIFF'S CLAIMS ARE NOT TIME BARRED. . . . . . . . . . . . . . . . . . . . . . . . . 28

VII.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## PLAINTIFF'S RESPONSE IN OPPOSITION
## TO THE TOWN OF HARPERSVILLE'S
## MOTION TO DISMISS AMENDED COMPLAINT

Comes now the Plaintiff in the above-styled cause and submits this response in opposition to the Town of Harpersville's ('City' or 'Harpersville') Motion to Dismiss (Doc. 49). As this Court is well aware, this litigation is one of many cases pending in Alabama federal courts against Judicial Correction Services, Inc. ("JCS"), Correctional Healthcare Companies, Inc. ("CHC"), CHC Companies, Inc. ("CHCC"), Correct Care Solutions, LLC ("CCS"), and various Alabama municipalities for similar civil rights and constitutional violations.[1] In *Ray v. Judicial Corrections Services, et al,* this Court addressed arguments similar to those presented here by Harpersville, ultimately denying the *Ray* defendants' motions to dismiss. *See Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428360 (N.D. Ala. 2013); *Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428395 (N.D. Ala. 2013).

In its introduction, the City wholly ignores the allegations of the First Amended Complaint by claiming that Ms. Carden failed to allege an official policy or custom of the City that violated her rights. As discussed further below, the Complaint is replete with descriptions of the City's joint policy and practice with its cohort JCS – which began with the City's contract binding its court to the use of the JCS collection system. (*See generally* Doc. 6 ¶¶ 20, 29, 33, 37, 38, 62, 115-118, 122). In fact "policy and practice" appears thirty-seven (37) times in the Complaint. Next, the City claims

---

[1] Each of the federal cases involves a different municipality and different plaintiffs. In addition to this case, two other pending actions in the Northern District of Alabama are currently before this Court: *Ray v. Judicial Correction Services, Inc., et al.*, No. 2:12-cv-02819-RDP (N.D. Ala. Filed Aug. 28, 2012); *Woods v. The City of Columbiana, et al.,* No. 2:15-cv-00493-RDP (N.D. Ala. Mar. 25, 2015). One case is in the Middle District, currently before Judge Lamberth: *Carter v. The City of Montgomery et al.,* No. 2:15-cv-00555 (M.D. Ala. Aug. 3, 2015). The remaining actions are currently before Judge Hopkins and are administratively stayed: *Hall v. Moore v. The City of Albertville, et al.,* No. 4:16-cv-00914-VEH (N.D. Ala. June 1, 2016); *Foshee v. The City of Anniston, et al.,* No. 1:16-cv-01030-VEH (N.D. Ala. June 23, 2016); *Hall v. The City of Fort Payne,* No. 4:15-cv-01656-VEH (N.D. Ala. Sept. 21, 2015).

that the only city employees participating in the scheme were its judge and magistrates and, for this reason, the City cannot be liable. Again, the City ignores the allegations plead all of which show involvement of the mayor, city council, treasure, police force, jailers. (*See generally* Doc. 6 ¶¶ 20, 37, 50, 59, 117-119, 139, 164, 188, 189, 206 ).[2] Next, the City attempts to limit Ms. Carden's claims to only the JCS contract, claiming that because the contract did not explicitly permit JCS and Harpersville to break the law, the law was therefore not broken. This line of reasoning is specious, at best. Ms. Carden's Complaint makes plain that the contract – signed and executed by the City's mayor and council – began a practice and joint scheme, which served as the moving force behind the violation of Ms. Carden's rights.[3]

## I.    PLAINTIFF ALLEGES PERSONAL FACTS THAT SUPPORT HER CLAIMS.

Unsurprisingly, Harpersville seeks to avoid any scrutiny of the actions that are plainly set out in Plaintiffs' Restated Complaint. The complaint illuminates the scheme, system, and joint operation of JCS and Harpersville, along with the specific effect on Ms. Carden. Ms. Carden was jailed nineteen (19) days prior to any adjudication of guilt, denied release because she was poor and could not pay the cash bond demanded, and then given JCS probation as her only choice to avoid being sent back to jail (and being charged $31 for each day she was in jail). She was unemployed and caring for her premature son, but those facts were not considered by the City or its confederate, JCS.

---

[2]In taking this position, the City also ignores further a robust body of law showing that, in fact, a City *can* be liable for the actions of its municipal court. (See *Giles v. City of Prattville*, 556 F. Supp. 612 (M.D. Ala. 1983); *Coleman v. Watt*, 40 F. 3d 255 (8th Cir. 1994); *Oglala Sioux Tribe v. Hunnick,* 2016 WL 697117 (Feb. 19, 2016); *Owen v. City of Independence, Mo.,* 445 U.S. 622 (1980); *Johnson v. Board of Police Com'rs*, 370 F. Supp. 2d 892 (E.D. Mo. 2005); *Miller v. City of Red Lodge,* 314 Mont. 278 (Mont. 2003)). These cases are discussed in more detail below.

[3] Footnote number 3 in Harpersville's brief is particularly striking. There, the City seemed to question whether it is the Plaintiff's theory that all municipalities contracting under a contract like the Harpersville/JCS contract should be held liable under § 1983. As is shown in the First Amended Complaint and the many lawsuits pending against numerous Alabama municipalities that used JCS, that is in fact Plaintiff's theory. For a listing of those case, please see Footnote 1, above.

Rather, she was charged hundreds of dollars for being in jail and then charged extra fees by JCS. Since she remained unable to pay the escalating fees JCS demanded, JCS requested that her 'probation' be revoked and that she be arrested. Per the practice at Harpersville, when Ms. Carden did not appear at the hearing JCS scheduled, the City issued a warrant for her arrest though there was no proof that Ms. Carden ever even had notice of the hearing. Despite these facts, the City claims that it did not harm Ms. Carden and these allegations are, somehow, not enough for it to know the constitutional claims against it.

## II. THE COMPLAINT PROPERLY ALLEGES UNCONSTITUTIONAL POLICIES AND PRACTICES OF THE CITY.

For purposes of Harpersville's Motion to Dismiss, Ms. Carden's allegations must be taken as true. Her Complaint goes into great detail to spell out the joint scheme between the City and JCS that led to the violation of her constitutional rights. (Doc. 6 ¶¶ 20, 46, 171, 175, 227, 237, 286, 322, 336, 360). Yet, Harpersville focuses onto one paragraph (i.e., paragraph 11 of the First Amended Complaint), claiming that is the *only* allegation made by Ms. Carden relating to this joint policy and practice. (Doc. 49, p. 13). The fact that Harpersville chooses to ignore the remaining paragraphs of Complaint does not avoid the fact that Ms. Carden's complaint properly pleads the joint practice and policy between the City and JCS in this scheme.

### A. The Complaint Alleges That the Mayor And City Council Are City Policymakers.

In Section II(a) of its brief, the City states that "as a matter of law, the Municipal Court's judicial officers cannot set policy on behalf of the City" (Doc. 49. pg 13) and spends the next seven pages arguing this point. This argument misses the point. The Complaint alleges that the city council and mayor are the policy makers of the City -- not the judges and magistrates. Among the many

paragraphs discussing this point are the following:

> 7.　　The Town of Harpersville, Alabama, ("Harpersville") is a municipal corporation located within Shelby County, Alabama. The City Council and Mayor **control the policy making for Harpersville**, and also hired the municipal court judge and contracted for the services of JCS, a private probation company, to collect its municipal court fines.

> 19.　　The agreement between Harpersville and JCS and signed by the City mayor Theoangelo Perkins attests that the Harpersville municipal "***court agrees that each court order shall provide*** for the following:
> a probation fee of $35.00 per month flat fee
> one time probationer set up fee of $10.00. . . . " (***emphasis added***).
> (Doc. 1-2)

> 20.　　Harpersville, through its mayor and council, approved the JCS contract on March 3, 2006 and continued the relationship thereafter fully aware of the practices and system of JCS and jointly participating in concert and approving in those practices. The City of Harpersville also approved the employment of Larry Ward as a part time judge of its municipal court.

> 37.　　The City Council and Mayor control the policy making for Harpersville and also hired the municipal court judge and contracted for services of JCS at the municipal court. The decision to use this JCS system was an administrative decision of Harpersville, by and through its mayor, and not a decision of the municipal court judge or the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC').

(Doc. 6, ¶¶ 7, 19, 20, 37; among others)

Next, Harpersville argues that it had no control over judicial acts of its city court. This misplaced argument is not new, as it was raised and rejected by this Court in *Ray*. Unlike determining who is a policymaker, the question of whether there is a municipal policy or custom for purposes of § 1983 is "an ad hoc determination made on a case-by-case basis." Sword & Shield: A Practical Approach to Section 1983 Litigation 4th Edition, p. 292. The Eleventh Circuit Pattern Jury Instructions further confirm that this inquiry is factual (11th Cir. Patt. Jury Instructions 5.6). However, even though determining whether a § 1983 policy or custom is factual, federal case law

has set the parameters of a policy, custom and practice for purposes of § 1983. Under 42 U.S.C. § 1983, local governmental entities may be sued in their own names for declaratory and injunctive relief as well as compensatory damages. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). Local government units are responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or action may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

Local governmental "policy or custom" actionable under § 1983 can exist in several forms. Certainly, there is an actionable policy when the appropriate officer or entity issues an ordinance, regulation, or other generally applicable policy statement and the subsequent, challenged action is an implementation of that official policy. *Id.* at 690. "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298 (1986). Here, the Mayor and council's policy decision in 2005 to bring JCS to the City for collection of city fines was the beginning of the practice challenged in this suit. That practice involved not only that particular decision, but the resulting scheme using the city court, police, treasurer and other city employees for a period of over seven years. The contract itself (despite the City's arguments) is not the sole basis for the Plaintiffs' claims, but instead the catalyst that began the challenged practice. By virtue of the contract, the City and JCS combined in a joint effort to extort persons unable to pay fines and costs.

"A 'municipal act' is not ... limited to only decisions made by the city's official legislative body or in written agreements. City policy also may be implicated by the acts of individual policymaking officials or by pervasive city custom." *Brown v. City of Fort Lauderdale*, 923 F. 2d 1474, 1480 (11th Cir. 1991). Specifically, local government units may be liable for constitutional

5

violations caused by a "governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 691. A plaintiff can establish a municipal custom by identifying "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F. 2d 1474, 1481 (11th Cir. 1991)(citations omitted). Such a practice is "deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir.1991)**.** The policymakers' deliberate indifference to or toleration of subordinate employees' behavior establishes a policy and practice attributable to the government entity, and that behavior is actionable under § 1983 if the plaintiffs' injuries were caused by acts taken pursuant to the policy, practice or custom. *See Canton v. Harris*, 489 U.S. 378, 390 (1989); *see also* 11th Cir. Patt. Jury Instructions 5.6.

The Complaint alleges that the City, acting through its mayor and council, entered into a contract with JCS. This was an administrative decision of the City – not the municipal court. (Doc. 6 ¶ 37) A decision of the decision-making person or body is, by definition, a policy of the municipality. "A plaintiff may … confer liability on a local governmental body, by showing either that the 'ultimate decision-making authority acted to deprive the plaintiff of a constitutional right or that the ultimate decision-making authority acquiesced in the deprivation by allowing a custom or practice of such deprivation to exist." *Bland v. Madison County, Fla*., 895 F. Supp. 1515, 1520 (N.D. Fla. 1995) (citing *Felton v. Board Of Comm'rs Of The County Of Greene*, 5 F.3d 198, 203 (7th Cir. 1993)). Stated differently, a city is liable "when the action alleged to be unconstitutional 'implements or executes a policy statement, ordinance, regulation or decision officially adopted and

promulgated by that body's officers,' or the action is 'visited pursuant to governmental "custom" even though such custom has not received formal approval through the body's official decision making channels.'" *Doe v. Miami-Dade County*, 797 F. Supp. 2d 1296, 1307 (S.D. Fla. 2011) (quoting *Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978)).

As alleged, the terms of the City's contract and widespread egregious practices resulting from the system implemented thereafter are the causes of Plaintiff's constitutional deprivations. The Mayor on behalf of the City agreed that, in consideration for the JCS "probation" services, the municipal court had to include in "each Court Order" sending a person to JCS a probation fee of $35.00 per month flat fee and a one time probationer set-up fee of $10.00. Since the City now admits in its motion that its Mayor did not have the authority to bind the court, the contract is due to be declared void *ab initio*. The City, however, does not - and cannot - dispute that the City did, in fact, enter into the contract (despite lacking authority to do so). That contract purported to bind its court and the court under Larry Ward ,obeyed. The result was the City profiting to the detriment of its poorest citizens. The lack of authority does not erase what was actually done or the system that sprang from that agreement. Nor, does the lack of authority avoid the fact that this was the City policy, implemented for years.

Regardless, none of these arguments support dismissal of the Complaint or change the fact that the allegations in the Complaint are properly pled. Ms. Carden's Complaint details the unconstitutional policies and practices of the City of Harpersville and its agents and satisfies the necessary pleading standards.

B.    **The City Judge and City Magistrate are not "State Officials."**

The City claims its part-time judge and city magistrate are "state officials." This statement

is contrary to the pleadings, contrary to the law, and would lead the Court into error. The cases[4] cited by Harpersville for support pertain to claims against **counties** -- not cities or municipal judges. Additionally, these cases analyze conduct of sheriffs -- not city judges or magistrates. In Alabama, sheriffs are considered state officials. To the contrary, here all of the activities are performed by people employed by Harpersville and subject to its control - none of whom are state officials. None of the allegations in the complaint reference sheriffs or counties and, as such, these arguments are inapposite.

The City correctly cites Ala. Code §12-14-50 for the proposition that a city judge's **authority** is established by state law. The complaint, however, alleges that Harpersville operated beyond the constitutional limitations on these powers under policies and practices established by the City. Furthermore, as the Complaint alleges, the city judge did not follow the policies, practices, and procedures . . . administered by the Alabama Supreme Court. Most notably, the Complaint alleges that the city court employees did not follow many Rules of Criminal Procedure and State statutes:

**1)** "**Rule 26.11 of the Alabama Rules of Criminal Procedure** provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances, none of which were followed by Harpersville."

**2)** "After a person such as Ms. Carden was arrested, the City calculated the amount for her bail based upon the amount claimed for fines, costs, and jail fees and required that sum for release. The City did not consider factors justifying release on recognizance or other factors under *Ala Rule Crim Pro* Rule 7.2. This practice resulted in excessive bail in violation of the Eighth Amendment."

**3)** Harpersville has systematically applied *Ala. Code* § 15-18-62 in an unconstitutional fashion, denying the Plaintiff and the Class she seeks to represent constitutionally protected rights.

---

[4] *Turquitt v. Jefferson County*, 137 F.3d 1285, 1292 (11th Cir. 1998) and *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326 (11th Cir. 2003).

(Doc. 6, ¶¶ 247, 256, 315, among others)

The City's policy and practice of criminalizing people by agreeing to place them on 'probation' due to their inability to immediately pay were supported by all branches of the City government to acquire increased revenue to the City and its confederate, JCS – all at the expense of constitutional principles. As the Complaint alleges, these constitutional violations are not constrained to one individual situation  – as was the case in *Garcia Guevara v. City of Haltom City*, 106 F. App'x 900, 902 (5th Cir. 2004) which the City cites (Doc. 49 p. 15).   This scheme in place since 2005 resulted in numerous constitutional violations supported and implemented by city employees, including its part-time judge, magistrate, city clerk, public defenders, prosecutors, accountants, mayor, city council, police, and its agent JCS. As such, the City's Motion to Dismiss is due to be denied.

## III.   THE CITY OF HARPERSVILLE IS LIABLE FOR ITS POLICY AND PRACTICE INVOLVING ITS MUNICIPAL COURT.

In its brief, Harpersville goes to great lengths to separate itself from its court, claiming the court cannot set policy for purposes of § 1983.  Unquestionably, the City Council (which approved the JCS contract) and the City Mayor (who signed the JCS contract) are policymakers for purposes of § 1983. As previously stated, a decision of the decision-making person or body is, by definition, a policy of the municipality. *Bland v. Madison County, Fla*., 895 F. Supp. 1515, 1520 (N.D. Fla. 1995) (citing *Felton v. Board Of Comm'rs Of The County Of Greene*, 5 F.3d 198, 203 (7th Cir. 1993)). Here, the City of Harpersville is liable for the egregious practices resulting from the policy and practice it implemented with multiple city employees. The fact that its court is one link in its collection practice does not protect the City from liability for a practice it began and participated in

for seven years.

Municipal courts in the state of Alabama are creatures of statute -- not constitutional requirement. Unlike a constitutional basis where all the branches of government are created independently and arise from the same source authority, city courts in Alabama are branches of the city (not the state) and are created by, and serving at the pleasure of, the city officials. This fact is even noted by the Judicial Inquiry Commission's advisory opinion cited by Harpersville in its brief. There, the Commission states that court personnel are "employed by the municipality and **answerable to the municipality**." (Doc. 49-2, p. 6 (emphasis added)). In addition to the City supervising the court employees, a municipal court may be created or abolished at a city's whim. A court is not required for a city, which has certain rights of self government. Specifically, the Alabama Code provides that a municipality's governing body *may choose* to have a local court or abolish it altogether and transfer jurisdiction to the county district court. Ala. Code §§ 12-14-1, 12-14-17(a). The City itself dictates the number of judges available to its court and determines the time and place where its court is to be held. Ala. Code § 12-14-3. Further, the City appoints the judges for its municipality and in the event the City has more than one judge, the mayor shall designate the presiding judge. Ala. Code § 12-14-30. The City provides the facilities, the necessary supportive personnel, and the prosecutorial services. Ala. Code § 12-14-2. Simply, the city court is maintained at the expense and option of the municipality and can be disbanded at the City's command.

In summary, municipalities can be subject to suit under § 1983 for policies and practices involving its municipal court.[5] Judge Hobbs from the Middle District of Alabama addressed this

---

[5]On this point, *Nunez v. City of North Las Vegas*, 116 Nev. 535 (Nev. 2000) is instructive. That case concerned a city's liability under § 1983 for a municipal judge's termination of the court administrator. There, the court stated even though city courts were part of the state judicial system:

issue in *Giles v. City of Prattville*, 556 F. Supp. 612 (M.D. Ala. 1983). That case concerned a § 1983 claim regarding the constitutionality of a sitting municipal judge acting also as the city's prosecutor. There, the original plaintiff was arrested and charged with possession of marijuana. At his hearing before the city court, the plaintiff learned that the city judge was also the city prosecutor. The plaintiff moved for the appointment of a separate prosecutor in his case, objecting to the judge's dual role. However, the city judge denied the plaintiff's motion after which the plaintiff filed suit in federal court. Although Judge Hobbs' opinion addressed several issues, he ultimately concluded that "[s]ince it is without dispute that it was the City of Prattville's official policy to have the Municipal Court judge serve both as judge and prosecutor in the City's Municipal Court, the City will be liable to the plaintiffs for damages." *Id.* at 617.

Similarly, the City of Little Rock was held liable for the due process violations that began with actions taken by its municipal court in *Coleman v. Watt*, 40 F. 3d 255 (8th Cir. 1994). There, the judge of the city court issued an "order" directing officers of the Little Rock police department "to impound any vehicle stopped for violating any one or more of some fourteen state statutes." *Id*. at 258. The plaintiff brought suit against the City of Little Rock under § 1983 after his car was impounded without an opportunity to appear before the judge to present proof of his car's registration and insurance. Among his claims, the plaintiff asserted a claim against the City for

---

[M]unicipal courts are primarily city, not state entities. Although municipal courts are created by the legislature pursuant to authority vested in that body by the Nevada Constitution, these courts are separate branches of their respective city governments. Accordingly, we conclude that the municipal court is not an extension of the state for purposes of suit under 42 U.S.C. § 1983. . . . We also conclude that the municipal courts of this state are separate branches of their respective municipal governments. **Because they are not state governmental entities, the respective municipalities may be subject to suits such as the instant matter.**

*Id.* at 962 (**emphasis added**).

violation of due process. **The Eighth Circuit held that the defendant city could be held liable for the plaintiff's due process rights due to the city's adoption of a municipal judge's impoundment order as city policy.** *Id.* at 262. For this reason, the Eighth Circuit did not need to "decide whether a municipal court judge acts as an official policymaker for the City of Little Rock..." *Id.* In the case at bar, *a fortiori*, the city contract signed by the Mayor even directed the contents of its court's probation order.

It is also worth noting that court policies and practices in a joint enterprise with others bind the joint actors under § 1983. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970) A federal district court in South Dakota granted partial in the plaintiffs' favor on this issue in *Oglala Sioux Tribe v. Hunnick,* 2016 WL 697117 (Feb. 19, 2016) under slightly different circumstances. That case centered on a series of policies and procedures put into place by the presiding judge of a judicial circuit in South Dakota relating to the removing of Indian children from their parents' care. *Oglala Sioux Tribe v. Hunnick*, No. 13-5020, Doc. 150 at p. 2 (W.D. S.D. Mar. 30, 2015). Plaintiffs, as putative class representatives, claimed these policies and practices violated Due Process and the Indian Child Welfare Act and sued the presiding judge, states attorney and employees from the Department of Social Services (DSS), all in their official capacities. *Id.* at 2-3. Plaintiffs then moved for partial summary judgment on several issues, one of which was whether the judge, states attorney and DSS employees were policy-makers and could be held liable in this joint enterprise for purposes of § 1983. The court ruled in the Plaintiffs' favor. Although the judge claimed the South Dakota Supreme Court was the final policy maker regarding the court policies at issue, the federal court first found that those policies were in fact created and revised by the presiding judge. Therefore, for purposes of those polices and procedures, the judge was the final policy-maker for purposes of §

1983. *Id.* at 25. The remaining defendants (i.e., the states attorney and DSS employees) took the position that they lacked the authority to challenge the court's policies and practices and therefore could not be liable under § 1983. *Oglala Sioux Tribe v. Hunnick,* 2016 WL 697117, *7-8 (Feb. 19, 2016). The court found that the "[d]efendants' position [was] untenable." *Oglala Sioux Tribe v. Hunnick*, No. 13-5020, Doc. 150 at p. 26 (W.D. S.D. Mar. 30, 2015). The court stated that "[w]hen these defendants did not challenge Judge Davis' policies for conducting 48-hour hearings, his policies became the official policy governing their own agencies." *Id.* (citing *Coleman v. Watt,* 40 F. 3d 255, 262 (8th Cir. 1994)). The Court went on to state that "'[b]y acquiescence in a longstanding practice' of Judge Davis 'which constitutes the standard operating procedure' of the Seventh Circuit Court, these defendants exposed themselves to liability." *Id.* at 27 (citations omitted). For those reasons, all defendants were subject to liability under § 1983.

Perhaps most telling is the fact that the City of Harpersville has already been held accountable for the actions of its court. In Judge Harrington's July 11, 2012 Order, he provided a thorough analysis of the extortion racket conducted by the Harpersville municipal court and went into detail about the City's rampant due process violations. Indeed, Judge Harrington noted that those "admitted violations are so numerous as to defy a detailed chronicling . . . " (Doc. 11-11 at p. 2). Judge Harrington first disbanded the Harpersville Municipal Court, and then enjoined the City of Harpersville from "incarcerating any individual in either the Shelby County jail or the Shelby County Community Corrections facility" without obtaining leave of court. (Doc. 11-11 at p. 5). The Order likewise prohibited the municipal court from incarcerating an individual without a hearing, making written findings of fact, and obtaining leave from the circuit court. The city – not the municipal court – was required to notify the court if any individual was convicted in the Harpersville Municipal

Court and sentenced to serve any type of incarceration. Further, all city council members were required to attend each hearing before the court until final resolution.

As was the case in the state litigation, Harpersville cannot avoid liability under § 1983 simply because its municipal court played a part in implementing the policy and practice resulting in constitutional violations.[6] Harpersville tries to avoid this fact by focusing in part on Advisory Opinion No. 14-926 issued by the Alabama Judicial Inquiry Commission, claiming that opinion addresses the "subject matter of this lawsuit." (Doc. 49, p.18). However, that opinion was limited to addressing the "accountability" of a municipal judge for constitutional violations in his or her court. Whether or not a municipal judge is "accountable" under the Canons of Judicial Ethics does not affect or preclude a city from being liable under § 1983 for a policy and practice involving its municipal court. More importantly, this JIC advisory opinion is not binding authority here: "a JIC advisory opinion is designed for the valuable but specific purpose of providing a safe harbor for a judge inquiring about ethical considerations; **it is not a conclusive statement of law** . . ." *City of Bessemer v. McClain*, 957 So. 2d 1061, 1088 (Ala. 2006)(statement of recusal rejecting the application of a JIC advisory opinion); *see also Ex parte City of Dothan Personnel Bd.,* 831 So. 2d 1, 6 (Ala. 2002)("'Similar to an advisory opinion of this Court pursuant to § 12-2-10, Code of

---

[6]A municipal court is not a separate legal entity, apart from the municipality that created it. However, even if the municipal court was a separate entity, Harpersville would still be liable for the constitutional violations made the basis of Plaintiffs' claims. *Johnson v. Board of Police Com'rs*, 370 F. Supp. 2d 892 (E.D. Mo. 2005) is compelling on this point. There, homeless persons brought a § 1983 claim against the city police captain and the city claiming that their Fourth, Thirteenth and Fourteenth Amendment rights were violated when they were periodically removed from downtown. In essence, the plaintiffs argued that the defendant police board, in connection with the city, had "a persistent custom of removing and discouraging homeless people from remaining in the Downtown area..." *Id*. at 895. The defendants moved to dismiss, which the trial court denied. The city argued there was no "legal tie" between the city and the police board and thus the city could not be liable for the alleged actions taken by the police officers. On this point, the court found that "the fact that the Defendants are separate legal entities does not prevent them from acting in concert to deprive constitutional rights pursuant to a joint policy or custom." *Id*. at 902. The fact that the city and its police board were "separate legal entities" did not bar the plaintiffs' § 1983 claims against the city.

Alabama (1975), the [Judiciary Inquiry] Commission's advisory opinions are not binding and **do not affect a party's rights or remedies**.").

Similarly, judicial immunity does not shield Harpersville from liability under § 1983. In *Giles v. City of Prattville*, 556 F. Supp. 612 (M.D. Ala. 1983), discussed above, Judge Hobbs found that the city could be liable to the plaintiff based on the municipal court's refusal to use a different prosecutor. The fact that the some defendant (*i.e.,* the judge of the city court) may have some form of immunity was no bar to the plaintiff's recovery. In reaching this, Judge Hobbs quoted Supreme Court precedent, stating: "a municipality has no immunity, either qualified or absolute, from liability for damages flowing from its constitutional violations, and that municipalities should be held accountable for their actions which inflict constitutional injury upon an individual." *Giles v. City of Prattville*, 556 F. Supp. 612, 618 (M.D. Ala. 1983)(citing *Owen v. City of Independence,* 445 U.S. 622 (1980)). Addressing municipal liability, the United States Supreme Court in *Owen* stated:

> By creating an express federal remedy, Congress sought to "enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape*, *supra*, 365 U.S., at 172, 81 S.Ct., at 476. . . . A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed. . . . .

> Moreover, § 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well. See *Robertson v. Wegmann*, 436 U.S. 584, 590–591, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978); *Carey v. Piphus*, 435 U.S. 247, 256–257, 98 S.Ct. 1042, 1048–1049, 55 L.Ed.2d 252 (1978). The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights. Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to

> minimize the likelihood of unintentional infringements on constitutional rights. Such procedures are particularly beneficial in preventing those "systemic" injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith. Cf. Note, Developments in the Law: Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1218–1219 (1977).

*Owen v. City of Indep., Mo.,* 445 U.S. 622, 650 52, 100 S. Ct. 1398, 1415 16, 63 L. Ed. 2d 673 (1980). Simply put, "there is no tradition of immunity for municipal corporations. . ." *Owen v. City of Independence, Mo.,* 445 U.S. 622 (1980). "[M]unicipalities do not enjoy immunity from suit – either absolute or qualified – under § 1983." *Brannon v. City of Gadsden*, 2015 WL 1040824 at n. 20 (N.D. Ala. 2015)(citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993) and *Owen v. City of Independence*, 445 U.S. 622, 650 (1980)); *see also Coleman v. Watt,* 40 F. 3d 255 (8th Cir. 1994)(declining to extend judicial immunity to a municipality in a § 1983 action when its employees acted pursuant to a court order and finding that the defendant municipality could be held liable for the violation of the plaintiff's due process rights due to its adoption of a municipal judge's impoundment order as city policy); *Johnson v. Board of Police Com'rs*, 370 F. Supp. 2d 892 (E.D. Mo. 2005)("refusing to extend the doctrine of judicial immunity to the City of St. Louis for the actions of its correctional officers based on a facially valid judicial order."); *Miller v. City of Red Lodge,* 314 Mont. 278 (Mont. 2003).

## IV. THE CITY'S UNCONSTITUTIONAL POLICIES ARE SHOWN BY ITS CONTRACT WITH JCS - NOT DEPENDENT ON IT.

Throughout its brief, the City attempts to limit Ms. Carden's claims to the City's decision to hire its judge and to contract with JCS. However, the Complaint makes plain that these are part -- *but only part* -- of the Plaintiff's Complaint. Noticeably, the City's Motion to Dismiss does not mention the alleged practice of using its police force and jails to extort money from its poorest

citizens or its practice of converting simple fines to prison sentences. Under Alabama law, a fine can only be converted into jail time if the court makes findings under Ala. Code § 15-18-62 (1975) that a defendant has willfully failed to pay the fines. Yet, under the system disclosed by the Complaint, if a person is unable to promptly and fully pay their fine and court costs, that person is placed on probation with JCS. The contract between JCS and Harpersville requires that every court order from the municipal court sending a person to JCS to also include a fee to JCS of $35.00 per month and start up fee of $10.00 per month. Thus, a person financially unable to pay an adjudicated fine will be placed on probation and ordered to pay additional charges even though they could not pay the adjudicated fine in the first place. Harpersville does not address this practice. As is clear from the charges made against Ms. Carden, often these individuals' fines are for violations brought about due to poverty, such as the inability to pay for a current tag decal or renewed license. These "crimes" are endemic of an indigent person struggling to make it. The City jointly participated with JCS for years under this system, providing space for JCS in its buildings, policing, arresting and jailing the "probationers" and sharing in the extorted funds. To suggest now that this was not based upon City policy ignores this history and the facts pled.

Over 20 years ago, our state Court of Criminal Appeals opined on a very similar case before it in *Crutcher v. State,* 439 So. 2d 725; (Ala. Crim. App. 1983). There, Mr. Crutcher had a suspended sentence revoked and was in jail for 30 days when he failed to pay a fine of $200.00 and court costs of $35.50 assessed to him when he pled guilty to a driving charge. Mr. Crutcher was indigent like the plaintiff in this case and, like with JCS and Harpersville, that fact did not matter. The Court of Criminal Appeals held:

> It is clear as a matter of constitutional law that an indigent defendant cannot be

required to serve jail time for nonpayment of fine and costs. *Tate v. Short, 401 U.S. 395 (1971); Lingle v. State, 51 Ala.App. 210, 283 So.2d 660 (1973); Smith v. State 51 Ala.App. 212, 283 So.2d 662 (1973)*. "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper, 548 F.2d 550, 554 (5th Cir.1977)*. This is not a case of a defendant who, though capable of paying a fine, refuses or neglects to do so.

Although *Section 15-22-52, Alabama Code 1975*, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale, 253 Ala. 550, 45 So.2d 865 (1950)*, our Supreme Court indicated that such a condition was contrary to our constitution.

"These benefits (probation and suspension of sentence) are not the subject of bargain and sale to be conditioned on the payment of costs and fees assessed as an incident to the prosecution and trial and to condition these benefits on the payment of such costs and fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides that 'justice shall be administered without sale, denial or delay.'"*Esdale, 253 Ala. at 553.*

*Crutcher* at 726. As shown by Ms. Carden's Complaint, the Plaintiff's claims are not limited only to the JCS contract, but encompass the joint system of fine collection from impoverished persons which was operated by these Defendants.

In fact, the contract itself is evidence of the City's joint policy and custom. As previously discussed, that contract is signed by JCS and Harpersville's Mayor and provides that the "City through its duly elected or appointed officials, is authorized to enter into a binding contract." That contract is for "probation supervision and related services for the benefit of the city and the court" and "the City and the Court enter into this agreement with JCS." (Doc. 18 pg. 150). The attachments to the contract give some specifics of the services to be provided and require that every court order at the municipal court sending a person to JCS will require the payment of fees to JCS. Nevertheless, Harpersville argues against the plain reading of its own contract in an attempt to avoid further scrutiny by this Court. That contract was signed by the Mayor and adopted as a matter of policy of

the City. Its directive was then followed by the city court and the system operated thereunder were then imposed on the people owing the city simple fines.

Though Exhibit A to the contract provides that indigent persons will not be charged the "standard probation fee," the actual application of this arrangement is to the contrary. As alleged, the named Plaintiff was indigent and charged those fees repeatedly for years. Furthermore, JCS officials, as well as the municipal judge of Harpersville, have affirmed that each looks to the other for the determination of indigency, and neither claims responsibility for making the inquiry. These are allegations of Ms. Carden's Complaint, all of which must be taken as true for purposes of Harpersville's Motion to Dismiss. Discovery will no doubt show further reprehensible action by these Defendants in their zealous collection of fines.

In its argument, Harpersville insinuates that the only reason the *Ray* litigation survived the motion to dismiss stage was because the JCS contract was not attached to the plaintiffs' complaint and therefore not before the Court. As this Court knows, the motions to dismiss filed in *Woods v. The City of Columbiana, et al*, No. 2:14-cv-00493 (N.D. Ala. Mar. 25, 2015) – presenting similar arguments – and were likewise denied by this Court, even though the contract was an exhibit to the *Woods* complaint. Simply, Plaintiff's claims are not limited to the contract, which serves as evidence of the unconstitutional policy and practice of the City.

Harpersville spends pages of its brief presenting a chart of various contract terms and arguing that Ms. Carden's claims fail because "[t]he contract neither mandated nor authorized the JCS actions alleged to be wrongful." (Doc. 49, 24). Harpersville then goes on to state that the contract did not permit JCS to "commandeer the Judicial process." (Doc. 49, p. 27). Of course, no contract could give any party the authority to commit wrongful, illegal and unconstitutional acts – or permit

19

a private for-profit company to take over a City's judicial process. However, the contract was only the beginning of the practice challenged here. Simply, the City is a joint participant in this extortion practice and cannot avoid liability by pointing at its joint actor, nor by attempting to hide behind the judicial immunity afforded only the city judge.

## V.     PLAINTIFF'S RICO CLAIMS AGAINST THE CITY ARE VIABLE

The United States Supreme Court has interpreted the RICO statutes broadly and has directed that these statutes should be liberally construed. See *United States v. Turkette*, 452 U.S. 576 at 587 (1981) (noting that "Section 904(a) of RICO, 84 Stat. 947, directs that '(t)he provisions of this Title shall be liberally construed to effectuate its remedial purposes'"). The definitional breadth of a RICO "enterprise" is evident by the array of court decisions that have held that state and local entities are "enterprises" for purposes of RICO.[7] These "enterprises" include police departments,[8] local prosecutors offices,[9] the office of the governor,[10] state administrative agencies,[11] state legislative

---

[7] See generally, Catherine Collier Stallings, Criminal Law -- Are Governmental Entities Appropriate RICO Enterprises?, 13 Mem. St. U. L. Rev. 96 (1982) (discussing United States v. Thompson, 685 F.2d 993 (6th Cir. 1982)).

[8] See, e.g., United States v. Davis, 707 F.2d 880 (6th Cir. 1983) (Mahoning County Sheriff's Office); United States v. Kovic, 684 F.2d 512 (7th Cir. 1982) (Chicago city police department); United States v. Lee Stoller Enters., Inc., 652 F.2d 1313 (7th Cir. 1981) (county sheriff's office); United States v. Welch, 656 F.2d 1039 (5th Cir. 1981) (sheriff's office); United States v. Bright, 630 F.2d 804 (5th Cir. 1980) (DeSoto County Sheriff's Office); United States v. Grzywacz, 603 F.2d 682 (7th Cir. 1979) (Madison, Illinois police department); United States v. Brown, 555 F.2d 407 (5th Cir. 1977) (Macon, Georgia municipal police department).

[9] See, e.g., United States v. Goot, 894 F.2d 231, 239 (7th Cir. 1990) (office of prosecuting attorney); United States v. Altomare, 625 F.2d 5, 7 (4th Cir. 1980) (Office of Prosecuting Attorney of Hancock County, West Virginia).

[10] See, e.g., United States v. Thompson, 685 F.2d 993 (6th Cir. 1982) (Office of the Governor).

[11] See, e.g., United States v. Dozier, 672 F.2d 531, 543 (5th Cir. 1982) (Louisiana Department of Agriculture); United States v. Frumento, 563 F.2d 1083 (3d Cir. 1977) (Pennsylvania Bureau of Cigarette and Beverage Taxes).

offices,[12] and commissioners.[13] Even judicial bodies have been used as the enterprise for purposes of bringing a RICO action.[14] "Criminal activity is private activity even when it is carried out in a public forum and even though the activity can only be undertaken by an official's use of a state given power; for example, the power of commutation and prevention of extradition vested in the governor by virtue of his official position." *United States v. Thompson*, 685 F.2d 993, 1001 (6th Cir. 1982).

The City cites *Pine Ridge Recycling, Inc. v. Butts Co., Ga,* 855 F.Supp. 1264, 1272-74 (M.D. Ga. 1994) (Doc. 49 p. 31), for the proposition that Ms. Carden's RICO claims against it should be dismissed. That case is distinguished from the facts in this case as it does not include RICO claims based on the predicate act of extortion.

In order to properly state a civil RICO claim under the Hobbs Act, the plaintiff must allege that a defendant obstructed, delayed, or affected commerce (or attempted to do so), by robbery or extortion. 18 U.S.C. § 1951. Extortion can occur through force, threat, violence, fear, or under color of official right. 18 U.S.C. § 1951(b)(2). In contrast to the predicate acts of fraud which were cited by the City, extortion does not require an affirmative act of inducement. In fact, the U.S. Supreme Court upheld the Eleventh Circuit in finding that "although extortion accomplished by fraud was a

---

[12] See, e.g., United States v. Blandford, 33 F.3d 685, 703 (6th Cir. 1994) (office of the representative for house district); United States v. Freeman, 6 F.3d 586, 596-97 (9th Cir. 1993) (office of the 49th assembly district); United States v. Long, 651 F.2d 239 (4th Cir. 1981) (office of South Carolina state senator); United States v. McDade, 28 F.3d 283 (3d Cir. 1994), (office of congressman).

[13] See, e.g., United States v. Barber, 476 F. Supp. 182 (S.D. W. Va. 1979) (West Virginia Alcohol Beverage Control Commissioner).

[14] See, e.g., United States v. Blackwood, 768 F.2d 131 (7th Cir. 1985) (Cook County Circuit Court); United States v. Robinson, 707 F.2d 872, 874 n.1 (6th Cir. 1983) (Office of District Judge of the Harlan District Court, Harlan County, Kentucky); United States v. Angelilli, 660 F.2d 23 (2d Cir. 1981) (New York City Civil Court); United States v. Sutherland, 656 F.2d 1181 (5th Cir. 1981) (Municipal Court of the City of El Paso); United States v. Clark, 646 F.2d 1259 (8th Cir. 1981) (office of county judge); United States v. Dean, 647 F.2d 779 (8th Cir. 1981) (Office of County Judge of Poinsett County, Arkansas); United States v. Bacheler, 611 F.2d 443, 450 (3d Cir. 1979) (Philadelphia traffic court); United States v. Vignola, 464 F. Supp. 1091 (E.D. Pa. 1980) (Philadelphia traffic court).

well-recognized type of extortion, there were other types as well."

It is perfectly clear, however, that **although extortion accomplished by fraud was a well-recognized type of extortion, there were other types as well.** As the court explained in *Commonwealth v. Wilson*, 30 Pa.Super. 26 (1906), an extortion case involving a payment by a would-be brothel owner to a police captain to ensure the opening of her house:

> The form of extortion most commonly dealt with in the decisions is the corrupt taking by a person in office of a fee for services which should be rendered gratuitously; or when compensation is permissible, of a larger fee than the law justifies, or a fee not yet due; but this is not a complete definition of the offense, by which I mean that it does not include every form of common-law extortion." *Id.*, at 30.

See also *Commonwealth v. Brown,* 23 Pa.Super. 470, 488–489 (1903) (defendants charged with and convicted of conspiracy to extort because they accepted pay for obtaining and procuring the election of certain persons to the position of schoolteachers); *State v. Sweeney*, 180 Minn. 450, 456, 231 N.W. 225, 228 (1930) (Alderman's acceptance of money for the erection of a barn, the running of a gambling house, and the opening of a filling station would constitute extortion) (dicta); *State v. Barts*, 132 N.J.L. 74, 76, 83, 38 A.2d 838, 841, 844 (Sup.Ct.1944) (police officer, who received $1,000 for not arresting someone who had stolen money, was properly convicted of extortion because "generically extortion is an abuse of public justice and a misuse by oppression of the power with which the law clothes a public officer"); *White v. State*, 56 Ga. 385, 389 (1876) (If a ministerial officer used his position "for the purpose of awing or seducing" a person to pay him a bribe that would be extortion).

*Evans v. United States*, 504 U.S. 255, 269-70, 112 S. Ct. 1881, 1890, 119 L. Ed. 2d 57 (1992)**(emphasis added)**

Ms. Carden's RICO claims against the City are specifically pled. In fact, the allegations of the Complaint state that the mayor, city council, police department and city clerks all participate in the extortion scheme. (Doc. 18 ¶¶ 18-69, 309-354) Courts have held that a municipality can be part of an association-in-fact enterprise. In *United States v. Cianci,* 378 F.3d 71 (1st Cir. 2004) the First Circuit held that a mayor can be a member of an association-in-fact enterprise consisting of himself,

his city, and his associates. As the First Circuit explained:

> Defendants' argument misses the mark because neither the indictment nor the jury instructions compel the conclusion that the City itself had to have formed an unlawful intent. It is uncontroversial that corporate entities, including municipal and county ones, can be included within association-in-fact RICO enterprises. *See, e.g., London,* 66 F.3d at 1244; Masters, 924 F.2d at 1366. It is also beyond dispute, as the Supreme Court held in *Turkette,* that "the term 'enterprise' as used in RICO encompasses both legitimate and illegitimate enterprises." 452 U.S. at 578, 101 S.Ct. 2524. As the D.C. Circuit elucidated:
>
>> [A restrictive] reading of 1961(4) would lead to the bizarre result that only criminals who failed to form corporate shells to aid their illicit schemes could be reached by RICO. [Such an] interpretation hardly accords with Congress' remedial purposes: to design RICO as a weapon against the sophisticated racketeer as well as (and perhaps more than) the artless.
>
> *Perholtz,* 842 F.2d at 353. Municipal entities can be part of an unlawful purpose association-in-fact enterprise so long as those who control the entities share the purposes of the enterprise. "RICO does not require intentional or 'purposeful' behavior by corporations charged as members of an association-in-fact." United States v. Feldman, 853 F.2d 648, 657 (9th Cir.1988). A RICO enterprise animated by an illicit common purpose can be comprised of an association-in-fact of municipal entities and human members when the latter exploits the former to carry out that purpose.

*United States v. Cianci,* 378 F.3d 71, 83 (1st Cir. 2004)

The law is well settled that "official-capacity suits" generally only represent an alternative way of pleading an action against an entity of which the official is an Agent. As long as the governmental entity receives notice and an opportunity to respond, an official-capacity suit is in all respects other than name, to be treated as a suit against the entity. *Busby v. City of Orlando*, 931 F. 2d 764 (11th Cir. 1991). Stated differently, "[b]ecause suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly..." *Id.* at 776; *see also Hardy v. Town of Haneyville*, 50 F. 2d 1176, 1184-85 (N.D. Ala. 1999); *Kentucky v. Graham*, 473 U.S. 159, 167 at n. 14 (1985)("there is

no longer a need to bring official-capacity actions against local government officials for … local government units can be sued directly for damages and injunctive or declaratory relief."). As such, naming the chief of police, mayor, and city council members as parties would be equivalent to naming the City which is unnecessary and redundant.

The City's next argument that it should not be responsible for its extortion scheme because RICO damages are punitive in nature is misplaced. The Eleventh Circuit has held that RICO damages are compensatory in nature as they seek to compensate for the loss incurred from the RICO activity - not punish the participants of the enterprise.[15] The Eleventh Circuit in denying an insurer's exclusion of coverage for RICO claims stemming from TCPA violations found that the trebling of the damages pursuant to RICO was compensatory in nature rather than punitive. In its analysis the Court stated:

> The Supreme Court has addressed the issue of whether treble damages should be considered compensatory or punitive in the context of several different statutes. Generally, Supreme Court "cases have placed different statutory treble-damages provisions on different points along the spectrum between purely compensatory and strictly punitive awards." *PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 405, 123 S.Ct. 1531, 1535, 155 L.Ed.2d 578 (2003). The Supreme Court has found that "the tipping point between payback and punishment defies general formulation, being dependent on the workings of a particular statute and the course of particular litigation." *Cook Cnty., Ill. v. United States ex rel. Chandler,* 538 U.S. 119, 130, 123 S.Ct. 1239, 1246, 155 L.Ed.2d 247 (2003).

---

[15] Compensatory Damages (for violation of the federal RICO and Georgia RICO Acts in Counts I, II, III, and IV)Plaintiff requests $10,206,826.05 in total compensatory damages under the RICO claims and for lost profits.15 The Magistrate Judge recommended that Plaintiff be awarded compensatory damages under Plaintiff's federal and Georgia RICO claims in the amount of $1,800,414.35, which when trebled amounts to $5,401,243.05.16 See 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of [the federal RICO Act] may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee...."); O.C.G.A. § 16–14–6(c). The Court finds no plain error in this finding. Plaintiff is entitled to compensatory damages in the amount of $5,401,243.05.

Functional Prod. Trading, S.A. v. JITC, LLC, No. 1:12-CV-0355-WSD, 2014 WL 3749213, at *8 (N.D. Ga. July 29, 2014)

In fact, treble damages statutes defy easy categorization as compensatory or punitive in nature. Whether treble damages under a given statute are considered compensatory or punitive is an intensely fact-based inquiry that may vary statute-to-statute. *Compare Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 151, 107 S.Ct. 2759, 2764, 97 L.Ed.2d 121 (1987) ( "Both RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees."), *Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 240, 107 S.Ct. 2332, 2345, 96 L.Ed.2d 185 (1987) (discussing the "remedial role of the treble-damages provision" in RICO), *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 575, 102 S.Ct. 1935, 1947, 72 L.Ed.2d 330 (1982) (noting antitrust private action, which allows for treble damages, "was created primarily as a remedy for the victims of antitrust violations," and stating that "[t]reble damages make the remedy meaningful by counter-balancing the difficulty of maintaining a private suit under the antitrust laws" (quotation marks omitted)), *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 485–86, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977) (characterizing § 4 of the Clayton Act, 15 U.S.C. § 15, which permits recovery of treble damages, as "in essence a remedial provision"), *Chandler,* 538 U.S. at 130–34, 123 S.Ct. at 1246–49 (stating, in a lawsuit against a municipal corporation, that "it is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives," and concluding a municipal corporation is a "person" subject to treble damages under the False Claims Act). . .

*Alea London Ltd. v. Am. Home Servs., Inc.,* 638 F.3d 768, 776–78 (11th Cir. 2011)

Additionally, our U.S. Supreme Court has stated that RICO is most analogous to the Clayton Act, which allows treble damages as the "carrot" for "private attorneys general":

Both RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees. Both statutes bring to bear the pressure of "private attorneys general" on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages. Moreover, both statutes aim to compensate the same type of injury; each requires that a plaintiff show injury "in his business or property by reason of" a violation.

The close similarity of the two provisions is no accident. The "clearest current" in the legislative history of RICO "is the reliance on the Clayton Act model." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 489, 105 S.Ct. 3275, 3281, 87 L.Ed.2d 346 (1985).

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* 483 U.S. 143, 151, 107 S. Ct. 2759, 2764, 97 L. Ed. 2d 121 (1987)

The City's citation to a Third Circuit opinion to the contrary is not the prevailing law in this Circuit and prevents it from prevailing on this argument. Should this Court require that each of the individual city employees within the enterprise be named as defendants, Ms. Carden requests leave to amend her complaint.

Additionally, the City's argument that Ms. Carden's 1962(c) claim is due to be dismissed because the RICO defendant (City) is also the enterprise misstates the complaint. The City cites *United States v. Goldin Indus., Inc.,* 219 F.3d 1271 (11th Cir. 2000) (Doc. 49 p. 31) for the proposition that Ms. Carden's claims should be dismissed because "she contends the Town is both the RICO enterprise and the RICO defendant." This statement misstates Ms. Carden's allegations as she alleges that the City (by and through its employees) is an enterprise with JCS and a joint RICO defendant. Furthermore, *Goldin* does not support the City's misstatement. Rather, it supports the fact that Ms. Carden adequately plead her claims:

> [W]e find the more analogous case in the Second Circuit to be *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256 (2nd Cir. 1995). There, the Second Circuit found that notwithstanding common ownership and a common officer and agent, each distinct corporation could be indicted individually as a person under § 1962© while also being considered jointly as constituting the enterprise. *Id.* at 263...We are satisfied that under the facts of this case, the Goldin corporations are distinct persons for the purposes of 18 U.S.C. § 1962© and that each Goldin corporation is distinct from the association consisting of the union of all three Goldin corporations which comprises the enterprise for the purposes of § 1962©. We thus find no reason to vacate the corporations' convictions under § 1962© on this basis. As the Goldin Corporations' challenge to their conviction for RICO conspiracy under § 1962(d)9 derived from their challenge to their indictment under § 1962©, that challenge also fails.

*United States v. Goldin Indus., Inc.,* 219 F.3d 1271, 1277 (11th Cir. 2000)

Ms. Carden alleges that the City employees and JCS are the enterprise and all are RICO defendants. (Doc. 6 ¶¶ 321-371)

Similarly, the City's argument that Ms. Carden's claims should be dismissed because she has not alleged sufficient facts under 1962(a), (b) is unsupported by the cases cited to support this assertion.[16] The cases cited by the City actually support the validity of Ms. Carden's claims. In *Local 560,* the government was successful in taking over a union to free it from the influence of organized crime and the *Masi* Court reversed the District Court and allowed Masi to proceed with 1962(a) claims against the Bank stating: "[W]e conclude that the district court must be reversed and that Masi may proceed against the Bank as both the person and the enterprise allegedly using the income derived from racketeering activity. In so doing we express no opinion on the merits of plaintiff Masi's 1962(a) claim or the validity of the predicate acts upon which the claim is based.[17]" *Id.* at 402. In fact, the circuits have developed a consensus that §1962 RICO claims can succeed when it can

---

[16] (Doc. 49 p. 32) "*see, e.g. Masi*, 779 F.2d. at 401, and § 1962(b) prohibits the infiltration or acquisition of an enterprise through racketeering activity, *see, e.g. United States v. Local 560 of the International Brotherhood of Teamsters*, 780 F.2d 267, 280 (3d Cir. 1985).

[17] Prior to stating its ruling the Court analyzed the requirements of "person" as separate from the "enterprise" stating:
We held that subsection (c) did require separate entities as the person and the enterprise but then stated:

However, a corporation-enterprise may be held liable under subsection (a) when the corporation is also a perpetrator. As we parse subsection (a), a "person" (such as a corporation-enterprise) acts unlawfully if it receives income derived directly or indirectly from a pattern of racketeering activity in which the person has participated as a principal within the meaning of 18 U.S.C. § 2, and if the person uses the income in the establishment or operation of an enterprise affecting commerce. *Subsection (a) does not contain any of the language in subsection (c) which suggests that the liable person and the enterprise must be separate.* Under subsection (a), therefore, the liable person may be a corporation using the proceeds of a pattern of racketeering activity in its operations. The approach to subsection (a) thus makes the corporation-enterprise liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering. This result is in accord with the primary purpose of RICO, which, after all, is to reach those who ultimately profit from racketeering, not those who are victimized by it. [Emphasis in original]

be shown that the racketeering activity income has benefitted the Defendants'. Ms. Carden has sufficiently plead her RICO claims against the City and Defendant's motion is due to be denied.

## VI.     PLAINTIFF'S CLAIMS ARE NOT TIME BARRED

As this Court well knows, the Eleventh Circuit has adopted the continuing violation doctrine. "In the context of actions brought pursuant to 42 U.S.C. § 1983, the continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Kellat v. Douglas County*, 2011 U.S. App. LEXIS 26442 (11th Cir. Ga. Apr. 7, 2011). Further, Harpersville never changed its "hold" on Ms. Carden for nonpayment of fines and that has prevented her from getting her driver's license since then. Neither Ms. Carden nor the putative Class members had any reason to know of the contract between JCS and the City of Harpersville much less of the collective extortion practice established by JCS and Harpersville. Neither Judge Harrington's order in July 2012 nor the Shelby County District Attorney motion in December 2012 provided the supporting facts alleged in Ms. Carden's complaint. Accrual of § 1983 violations is a question of fact and, as such, Harpersville's Motion to Dismiss is due to be denied. *See Ray v. Judicial Corrections Services,* 2013 WL 5428395 at *10 (N.D. Ala. 2013)("[A] greater level of factual development is required to make such an evaluation, reinforcing the notion that 'a statute of limitations defense is generally not appropriate for evaluation on a motion to dismiss filed pursuant to Rule 12(b)(6)...Because it is not facially apparent that Plaintiffs' claims are time-barred, JCS's motion to dismiss on a statute of limitations basis is denied."). As such, dismissal based on statue of limitations is premature at this time. Finally, JCS has been on notice about these claims since August 28, 2012 when the *Ray* case was filed and prior to that from the state court action against Harpersville and JCS. See *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538

(1974).

## VII.    CONCLUSION[18]

Based on the foregoing reasons and cited authority, Harpersville's Motion to Dismiss is due

to be denied.

RESPECTFULLY SUBMITTED,

s/ G. Daniel Evans
G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
Attorneys for The Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com

s/ William M. Dawson
William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209
Telephone: 205-795-3512
E-Mail: bill@billdawsonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of September, 2016, I electronically filed the foregoing
Plaintiff's Response in Opposition to the Town of Harpersville's  Motion to Dismiss Amended

---

[18]Harpersville drops a footnote, as an afterthought, claiming that Count Eleven of Ms. Carden's Complaint should be dismissed in its entirety because JCS has left the State of Alabama. While that fact may affect the injunctive relief requested as to prohibiting the City from contracting with JCS, JCS' departure does not moot the declaratory relief requested thereunder, including whether the Town's contract with JCS is void *ab initio,* and that effect on plaintiff's other claims.

Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

L. Conrad Anderson IV
Gregory C. Cook
Will Hill Tankersley
Ginny Willcox Leavens
Balch & Bingham, LLP
1710 6th Avenue North
P.O. Box 306
Birmingham, AL 35201

Larry S. Logsdon
Michael L. Jackson
Wesley K. Winborn
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
P.O. Box 530910
Birmingham, AL 35253

F. Lane Finch, Jr.
Brian C. Richardson
SWIFT CURRIE MCGHEE & HIERS, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203

s/ G. Daniel Evans
G. Daniel Evans
