FILED
2017 Oct-23  PM 08:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DANA CARDEN** | ) | |
| | ) | |
| **Plaintiff;** | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | **2:15-cv-01381-RDP** |
| **THE TOWN OF HARPERSVILLE;** | ) | |
| **a municipal corporation; JUDICIAL** | ) | |
| **CORRECTION SERVICES, LLC  a corporation.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**SECOND AMENDED AND RESTATED COMPLAINT**

COMES NOW, Dana Carden, (hereinafter "Plaintiff") by and through her undersigned counsel, and, pursuant to this Court's opinion and order of September 21, 2017(Doc. 110, 111), files this Second Amended and Restated Complaint as follows:

**JURISDICTION**

1.      The Court has jurisdiction over this matter because it concerns a controversy arising under the Constitution of the United States.  28 U.S.C. §1331.  This is a civil rights action brought under 42 U.S.C. §§ 1983 and 1988 and pursuant to 18 U.S.C. 1962.

2.      This Court also has jurisdiction of this action by virtue of 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), authorizing jurisdiction of claims brought under 42 U.S.C. § 1983 to enforce civil rights guaranteed by the United States Constitution and by virtue of 18 U.S.C. 1964(a).

3.      Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

**PARTIES TO THE COMPLAINT**

4.      The plaintiff Dana Carden is an individual resident of Sylacauga, Talladega County, Alabama.

5.      The Town of Harpersville, Alabama, ("Harpersville" or "Town") is a municipal corporation located within Shelby County, Alabama. The City Council and Mayor are policy makers for Harpersville, and also hired the municipal court judge and contracted for the services of JCS, a private probation company, to collect its municipal court fines and were aware of the operations and practices of JCS there for a period of over five years.

6.      The defendant Judicial Corrections Services, LLC (hereinafter "JCS") is a Delaware corporation, registered as a foreign corporation and, during the time of the facts alleged in this complaint, was doing business in the State of Alabama and in this District. JCS marketed itself in Alabama as "not a social service agency," but a "for profit"company which offered services to governmental entities "free of charge" to the cities as "an offender paid system."  At all times, JCS has operated under the color of state law.

**FACTS**

7.      For many years it was the policy and practice of the Town of Harpersville and its agent, JCS, to incarcerate people when they could not afford to pay fines to the Town for traffic violations and other misdemeanor offenses. This practice was carried out without conducting any inquiry into the person's ability to pay, without considering alternatives to imprisonment and without providing adequate counsel either during court proceedings, at JCS 'revocation hearings,' nor while the accused was jailed and while insisting on cash bail beyond the means of those arrested.

8.      It was also the policy and practice of the Town to incarcerate people in the

Shelby County Jail and to charge the incarcerated people even prior to any determination of guilt, $31.00 per day for each day they were in jail with no consideration of their poverty. This practice was carried out by the Town without any court order or directive to that effect with collection of the added jail fees also being pursued by its agent JCS.

9.      These practices of the Town and JCS used incarceration, and the threat of incarceration, to coerce payments from impoverished debtors and their family and friends by persons and entities financially interested in the process.

10.     The Plaintiff brings this action because the policy and practices of Harpersville and JCS have violated her statutory and constitutional rights.

**DANA CARDEN**

11.     Dana Carden was stopped February 25, 2009, by a Harpersville  police officer and given traffic citations for: Speeding, Driving with No Insurance and Driving without a License.

12.     These citations for the charges of Speeding, No Insurance, and Driving without a License did not include a court date on the copy Ms. Carden was given.

13.     The Officer told Ms. Carden to expect a letter from the Town within 30-60 days notifying her of her court date in which she would be required to appear and answer for her charges.

14.     Ms. Carden never received notice of a court date nor did she receive a letter from the Town regarding the traffic citations.

15.     On Saturday, May 22, 2010, Ms. Carden was riding in a vehicle that was stopped by a road block in Sylacauga. Sylacauga police officers told her that she had three outstanding warrants by the Town of Harpersville.

3

16.     Each of the warrants issued by the Harpersville magistrate Penny Hall for Ms. Carden listed the underlying traffic charges as the reason for the arrest - speeding, no proof of insurance, and driving with license revoked.  Each warrant demanded a cash bond to secure her release from jail - speeding ($378), no proof of insurance ($528), and driving with license revoked ($528).

17.     Ms. Carden was arrested and taken to the Shelby County jail.

18.     A cash bond of $1,434 was preset before her arrest by Ms. Hall and was required for Ms. Carden's release from jail  despite the fact that she had not been found guilty of any charge, was not arrested on an FTA order, was not currently assessed jail time for any crime, was not a flight risk, was unemployed, impoverished, and was caring for her five-month-old premature baby.

19.     Harpersville records show that Penny Hall, the Town magistrate, filled out an 'Order on Initial Appearance' and an 'Advice of Rights on Initial Appearance' (Exhibits 4 & 5)[1] documenting the demand for a cash bond of $1,434 plus an additional $31 per day for each day Ms. Carden's court date was set for June 10, 2010.

20.     Since she was unable to pay the cash bond, Ms. Carden remained in the Shelby County jail for nineteen (19) days until Harpersville had its next court session on June 10, 2010.

21.     Though a public defender was listed on Ms. Carden's jail records, Ms. Carden never saw or talked to a lawyer. In fact, throughout all her dealings with Harpersville's criminal process, Ms. Carden was never provided with a lawyer.

---

[1] State of Alabama Unified Judicial System Form C-80 Rev.8/2000 and Form C-82 Rev.11/92.

22.     Cities that choose to establish a city court are required by state statute to provide indigent defense. (Ala. Code § 12-14-9 - A municipality which retains its court shall provide indigent defense services as otherwise provided by law.)

23.     Harpersville violated this state law and the constitutional rights of Ms. Carden and other poor people by not providing adequate counsel though subjecting her to jail.

24.     This Harpersville practice violated state law and the constitutional rights of Ms. Carden and other poor people by not providing counsel despite obvious indications that those unable to buy their way out of jail were living in extreme poverty.

25.     As a result of Harpersville's failure to provide her counsel, Ms. Carden languished in jail for nineteen (19) days, was charged for each of these days, and was required to appear before the City's part-time judge with no advocate.

26.     On June 10, 2010, Ms. Carden and seven (7) other inmates who would have been released if a cash bond had been paid, were brought from the Shelby County jail to the Harpersville municipal court. All of the inmates were dressed in orange jail attire, shackled, wearing handcuffs and were seated on the front row of seats in the room where court was held.

27.     On June 10, 2010, the docket was called in alphabetical order and the inmates on the front row appeared as their name was called.

28.     Ms. Carden approached the table when her name was called. She was wearing an orange jumpsuit, handcuffed and shackled as she stood before Larry Ward acting as judge for the Town.  She had no charges against her other than the traffic tickets.

29.     Ms. Carden was not represented by counsel at this hearing despite the fact that a public defender was listed on her jail records and despite the state law and

constitutional requirements that she be represented by counsel if there is any possibility of being jailed.

30.     The city prosecutor did not participate and did not explain the many days Ms. Carden had spent in jail for her unadjudicated traffic tickets.

31.     Ms. Carden was not employed and no family was able to attend court so she was not able to immediately pay the fines and court costs assessed.

32.     With no lawyer, Ms. Carden did not know that she was entitled to a non-monetary punishment because of her poverty. With no lawyer, Ms. Carden was given a money fine.  All who were involved in this court proceeding, JCS, Larry Ward and the Town of Harpersville, were financially motivated to pursue money than seek justice.

33.     Ms. Carden was not given 'credit' for the nineteen (19) days she spent in jail against the Town fines and fees as required by state statute.  Instead, Harpersville through its clerk added daily jail charges to her bill for each day it confined her even though those days predated any finding of guilt.

34.     On June 10, 2010, Larry Ward found her guilty of the three (3) traffic tickets and assessed fines and court costs of  speeding ($172.50), no proof of insurance ($372), and driving with license revoked ($422.50).

35.     Since Harpersville's policy and practice was to add jail fees of $31 for each day a person spent in jail, these jail fees were added to Ms. Carden's balance - despite the fact that she was jailed prior to any adjudication of guilt and that her sentence did not include any jail time.

36.     Of these eight inmates present that day with her, the jail records show Ms. Carden and four others with their employer as "Unemployed" and one inmate had no

employer information listed at all.

37.     Consistent with the practice at Harpersville, all of these eight inmates would have been released from jail and not charged $31/day if they had been able to pay the cash bond demanded for their release at the time of their arrest.

38.     Ms. Carden was not provided counsel and none of the five (5) of the other inmates in shackles and jumpsuits had attorneys, despite the obvious fact that all were so impoverished that none was able to post the cash bond demanded to buy their freedom.

39.     Pursuant to the Town's contract and practice with JCS, when Ms. Carden and six (6) of the other inmates stated their inability to pay the fines assessed, all were escorted to the mayor's office to meet there with JCS employees which began their "probation" for collection of fines and fees.

40.     Harpersville had previously hired Larry Ward as its part time municipal judge. Ward's full time job was selling municipal bonds and giving cities financial advice - not practicing law. In fact, Ward never practiced law but had assisted Harpersville in issuing municipal bonds whose payments were thereafter largely funded by revenue from city fines which Ward levied.

41.     Upon information and belief, Ward facilitated the sale of Harpersville municipal bond warrants by his employer Morgan Keegan in 2010 which were underwritten based on Harpersville financial statements showing approximately 50% of the city revenue coming from its city court fines levied under Larry Ward.

42.     These bond warrants had a competitive rating by the bond rating company Standard & Poors while Larry Ward was the city judge generating the revenue stream from the fines he levied.

7

43.    After the city court was closed and the municipal cases were moved to the Shelby County District Court, Harpersville's bond ratings suffered by becoming unrated securities.

44.    During his tenure there, Larry Ward had a personal, financial interest in ensuring that the Harpersville court generated money for the Town to support the bond issue.  Larry Ward's had a personal financial interest in maximizing court revenue, all of which was known to the Town officials who participated in the bond issue.  This financial interest while being the judge violated the due process of litigants appearing before him which requires that a neutral judicial officer participate in judicial proceedings.

45.    As part of the practice at Harpersville with JCS, Larry Ward typically signed JCS form 'probation' orders in blank allowing the JCS employees to fill in the orders without any oversight being undertaken by the City.

46.    In 2012, Larry Ward testified under oath admitting that, although he had been the judge in Harpersville for 12-15 years and was currently serving as a city judge in six other cities, but was not familiar with Alabama Rule 26.11 of the Rules of Criminal Procedure.  His lack of knowledge about this rule is also consistent with the actions at the Harpersville court ignoring U.S. Supreme Court precedent in *Bearden v. Georgia*, 461 U.S. 660; 103 S. Ct. 2064; 76 L. Ed. 2d 221 (US 1983) which requires all courts to conduct a meaningful inquiry into the reasons a person has not paid a fine and any willful refusal to pay the fine before incarceration can be employed.  The Town's focus on revenue collection and its knowing employment of JCS and Ward, each with financial interests in a judicial process, established a long-term practice routinely denying due process to persons such as Ms. Carden.

47.     Due to this Town practice, when Ms. Carden appeared in its court, neither Larry Ward, the prosecutor, the police, the magistrate, nor anyone there made any inquiry into the economic status of Ms. Carden despite the fact that she was obviously impoverished and unable to post the cash bond demanded to secure her release from jail.

48.     After being found guilty on traffic tickets and given fines she could not pay, Ms. Carden was escorted to the mayor's officer where she met with JCS and was told to sign papers for their payment plan or else go back to jail.

49.     Harpersville had contracted for JCS to collect all its fines and fees and Ms. Carden was required to sign the JCS papers in exchange for her release from jail. These papers which JCS filled in required her to make monthly payments of $145 to JCS for her to pay JCS $45 each month she was on 'probation' plus a $10 set up fee.

50.     JCS determined this $145/minimum monthly payment pursuant to its policy and practice as defined in its training manual. (Exhibit 9 p. 14 ¶1(d))

51.     JCS also demanded that Ms. Carden go to the JCS office for her first 'appointment' six days later and pay $145 within thirty (30) days despite the fact that she was in an orange jumpsuit and shackles and despite her continued statements that she was unable to pay - and would be unable to pay - this amount because she did not have a job and was caring for her premature son.

52.     The JCS preprinted and pre-signed "order of probation" listed "conditions" of probation containing unconstitutional restrictions on her liberty, which included: 1) not changing residence or employment without notifying JCS, 2) avoiding "injurious or vicious habits," 3) working diligently at a lawful occupation, unless a full time student, 4) "truthfully answer all inquiries" by the JCS employees and "comply with all instructions" the JCS

employee gives. In addition to these unlawful constraints, the order states in bold type - **"You are subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly."**   Under the collection practice used at under the Harpersville contract for many years, none of these restrictions were imposed upon persons who fully paid their fines and costs when levied.

53.     JCS' "orders of probation" were preprinted forms provided by JCS which Larry Ward presigned in blank.

54.     The "Order of Probation" which JCS filled in for Ms. Carden showed an inflated total amount claimed of **$1,662** - Speeding (fine - $100, Court Costs - $129 & $229 jail fees), DWL (fine - $300, Court Costs - $179 & $479 jail fees), No Proof of Insurance (fine - $300, Court Costs - $129 & $429 jail fees)(Exhibit 5).

55.     Ms. Carden's 'Order of Probation' greatly exceeded the court orders of her traffic tickets which instead stated that she owed a **total of $967.50** - Speeding (fine - $100, Court Costs - $72.50), DWL (fine - $300, Court Costs - $122.50), No Proof of Insurance (fine - $300, Court Costs - $72.50). (Exhibit 2)

56.     Despite no court order, once Ms. Carden was put on 'probation' with JCS, JCS demanded that she pay a **total of $2,173.** JCS records show that it charged Ms. Carden $967 for her speeding ticket, $628 for Driving with no License, and $578 for No Insurance- all despite no order of the court requiring her to pay these amounts. (Exhibit 8 p.2)

57.     These additional, unnamed fees were charged without a court order, without an opportunity for Ms. Carden to dispute these charges, without adequate counsel, and with none of the other requirements of due process.

10

58.     Ms. Carden's friend paid $50 to JCS on June 16, 2010. JCS took $20 of the $50 payment for itself (allocating $10 to the setup fee and $10 to her 'probation' fees) and credited $30 to her fine balance.

59.     Despite its knowledge that Ms. Carden was unemployed as of June 16, 2010, on August 13, 2010 JCS still demanded that Ms. Carden pay $2,143 to the Town of Harpersville and $125 to JCS. (Exhibit 7)

60.     Ms. Carden was and has been impoverished and was not able to pay for her insurance - much less the fines and fees for JCS, but, in accordance with the policy and practice of Harpersville which was established after contract with JCS, she was required to pay JCS as well.

61.     On August 13, 2010, JCS' ProbationTracker system shows that JCS employee, Sheree Fomby, generated three forms in the system - a Petition for Revocation Letter, a Violation Report, and a Notice to Show Cause. There is no evidence that Ms. Carden was ever notified of these forms. (Exhibit 8 p.2)

62.     These three (3) JCS forms were not filed with the city court and neither JCS nor the Town or court personnel took action to ensure that Ms. Carden received notice of these forms.

63.     Under the practice at Harpersville when its monthly minimum payments were not paid, JCS selected a court hearing date and generated its form Petition for Revocation. After generating this form, JCS put Ms. Carden's name on the 'JCS docket' at Harpersville with its petition requesting that a warrant for her arrest be issued when she did not appear at the court hearing JCS scheduled.

64.     On September 9, 2010, JCS petitioned the Harpersville city court to revoke

Ms. Carden's 'probation'. Based upon this petition, the city judge ordered that a hearing

date be set and a copy of that order served on Ms. Carden as follows:

<u>ORDER</u>

It appears to the Court that a Petition for Revocation of Probation and Statement of Delinquency Charges having been filed in the Harpersville Municipal Court, a copy of which is attached hereto and incorporated herein by reference, and **the Court having reviewed said Petition, is of the opinion that a hearing should be held to determine whether or not the Defendant-Probationer is in violation of the terms of her probation as charged in said Petition.**

**NOW, THEREFORE IT IS ORDERED, ADJUDGED AND DECREED that a Revocation Hearing be set** before this Court to determine if the  Defendant-Probationer has violated the terms of her probation and as a result should, therefore, have the period of her probationary sentence revoked and the original sentence of the Court imposed.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED that a true copy of this Petition, together with the conditions of probation and all other relevant documents be served upon the above named Defendant. Consider this order suspending time on this case until a resolution is decided.**

(Exhibit 7)**(emphasis added)**

65.     Larry Ward signed this Order and it is dated September 9, 2010.

66.     Though the order directs that a hearing be set and notice given, under the

practice at Harpersville neither JCS, nor the City Magistrate, Ms. Penny Hall, nor the city

prosecutor, Bo Shaw, nor any other employee attempted to schedule this hearing or deliver

this petition as ordered by this signed petition.

67.     Instead, the next day on September 10, 2010, JCS updated its records

showing a warrant was issued. (Exhibit 8 p. 2)

68.     Upon information and belief, this warrant for Ms. Carden's arrest listed the

original traffic citations as the reason for the arrest, which was not probable cause, as Ms.

Carden only owed fines with no jail sentence and there was no order validly requiring her

arrest.

12

69.     The policy and practice of the Town magistrate and JCS was to immediately issue a warrant for a person's arrest even though the judge ordered only that a hearing be scheduled and that the petition be delivered to the 'probationer.'  As a result under this practice there were no revocation hearings or notice to people such as Ms. Carden.

70.     Since neither JCS nor the city magistrate nor the city prosecutor or anyone else at the Town attempted to deliver the signed Petition and related documents to Ms. Carden or schedule a hearing, Ms. Carden never had notice of any hearing or an opportunity to contest any allegations against her.

71.     These actions were taken under the practice used for years at Harpersville, and despite the lack of notice to Ms. Carden about the hearing and despite the fact that JCS, a private party, had no legal authority to demand her presence at the city court.

72.     Throughout this period of time, JCS provided no services to Ms. Carden and acted merely as a collection agency charging additional fees and, despite knowledge that Ms. Carden was unable to pay these fines and impoverished, Harpersville's agent, JCS, sought to charge and collect these unlawful fees without any due process.

73.     As a result of a lawsuit filed in Shelby County Circuit Court (CV-2010-900183), the Harpersville Municipal Court became the subject of an ongoing investigation and serious questions were raised regarding the integrity of that court and its processes and procedures and ultimately its Judge Larry Ward.

74.     On August 8, 2012, the Town Council of Harpersville voted to dissolve the Harpersville Municipal Court and the pending cases were then transferred to the Shelby County District Court for further action.

75.     On December 27, 2012, Assistant District Attorney Alan Miller filed a motion

in the District Court of Shelby County requesting that the Court 'remit all outstanding fees, fines and costs and to establish this account as "Paid in Full"' for all the active traffic cases from Harpersville. (Doc. 1-4). That same day, Judge Ronald Jackson, Presiding District Judge of Shelby County, ordered that all traffic cases listed in the motion were declared PAID IN FULL and ordered that any warrant associated with the case was recalled, set aside and held for naught.

76.     While the District Court ordered that all the traffic cases listed in the motion be declared PAID IN FULL, Ms. Carden has never received compensation for damages she sustained as a result of Harpersville's illegal policies and practices with its agent JCS.

77.     Ms. Carden never received notification from the Town of Harpersville or JCS that her probation was terminated, that her fine balance was declared paid in full, or that the warrant for her arrest had been recalled.

78.     After hearing the Harpersville tickets had been cleared, Ms. Carden called the  clerk's office and was told that there were some cancellations, but she did **not** get confirmation that the outstanding warrant for her arrest was recalled.

79.     Ms. Carden has never received remuneration for her illegal imprisonment or for the JCS fees she paid.

80.      Ms. Carden has not been compensated for the violations of her constitutional rights.

**Harpersville Practices with JCS**

81.     As a policy and practice, neither the Harpersville court nor JCS conducted *Bearden* hearings or inquired into the offender's ability to pay, or allowed offenders to fill out hardship forms requesting community service or other alternatives due to poverty.

These parties were all motivated to ignore these constitutional requirements by their financial interests in the processes.

82.     The policy of not conducting *Bearden* hearings flourished because Harpersville did not provide adequate counsel for the poor people appearing in its city court. All cities in Alabama that elected to establish a city court are required by Alabama statute to provide counsel to the poor appearing before its court and the U.S. Constitution requires that counsel be provided when a person may face jail time.

83.     Neither the Town nor JCS made any attempt to inform poor people that they should not be legally jailed for an inability to pay. Rather, under this joint practice, persons like Ms. Carden were threatened with jail by JCS, warrants were issued by the magistrate and the persons were arrested by the city police when they could not pay as demanded after which they were kept jailed unless cash bonds preset by the magistrate equating the money demanded was paid.

84.     The Town imposed jail fees and unreasonable cash bond requirements for non violent misdemeanants as a matter of policy. These cash bonds were demanded to pay for the person's freedom even before a person was convicted of any crime and even included jail fees the Town claimed without any court order justifying the same.

85.     Under the practice and scheme implemented for years at Harpersville, neither the prosecutor, magistrate, judge, JCS employee or public defender (if one was provided) undertook any determination of the reasons for nonpayment, and did not consider such things as the Plaintiffs' disability, unemployment, or assets in regard to the nonpayment of the fines.

86.     Under the practice scheme implemented for years at Harpersville, the

Harpersville employees, its court and its agent, JCS employees, denied any responsibility to investigate poverty or even acknowledge obvious indigency, and the Town police force regularly arrested people for non violent city crimes for which there was no jail penalty imposed - only money owed.

87.     Under the scheme implemented by Harpersville, after simple fines were converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment schedule. This Harpersville practice used JCS petition to revoke their probation to incarcerate individuals who, had they been financially able to pay at the point of adjudication, would have paid only a fine with no probation whatsoever. These warrants were issued without any hearing scheduled actually revoking the probation and without notice and an opportunity to contest the charges against them.

88.     Under the practice at Harpersville, the post-adjudication collection process was managed and implemented by JCS - including petitions requesting a warrant for arrest and well known at the city.

89.     This policy of having a financially interested party, i.e., JCS, acting as a probation officer was determined, known and tolerated for years by the Harpersville City Council and Mayor who are final policy makers for the city.

90.     The Town created and tolerated the policy and practice of having JCS, a financially interested party, determine if a person is fully compliant with the court's presigned order and then testify against the offender in court. This agreement between the Town, its court and JCS was stated in the contract between the parties. "Any probationer that is not complying with the terms set forth in the court order will be returned to the court of original jurisdiction. A which time the [JCS] officer will testify as to the circumstances of

the case, giving the probationer full opportunity to refute any or all points..." (Exhibit 1 p. 1 ¶ G)

91.     Harpersville did not seek bids for this contract. Rather, it granted JCS this exclusive contract in violation of Ala. Const. Art. I, § 22 and Ala. Code 1975, §41-16-50.

92.     The agreement between Harpersville, Harpersville's court, and JCS was signed by the City mayor,   Theoangelo Perkins, and it attests that the Harpersville municipal "***court agrees that each court order shall provide*** for the following:

> a probation fee of $35.00 per month flat fee

> one time probationer set up fee of $10.00. . . . " (***emphasis added***).

> (Exhibit 1 p. 3)

93.     Harpersville, through its mayor and council, approved the JCS contract on March 3, 2005 and continued the relationship thereafter until 2012, fully aware of the practices and system of JCS and while jointly participating in concert and approving in those practices. That joint activity included providing its police and jail facilities to enforce the collection/extortion efforts of JCS.

94.     The City Council and Mayor control the policy making for Harpersville and also hired the municipal court judge and contracted for services of JCS at the municipal court. The decision to use this JCS system was an administrative decision of Harpersville, by and through its mayor, and not a decision of the municipal court judge or the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC').

95.     Harpersville, through its contract, pattern and practice, clothed JCS with the appearances of state authority and has previously even allowed JCS employees to carry badges.  The JCS employees attended each municipal court session and were provided

17

the mayor's office for its use during court sessions while being referred to as "probation officers" though none had such authority under Alabama statutes.  Under this system, "offenders" were not permitted to pay fines at the city clerk's office, but were instead required by Harpersville to make all payments, including those for fines, restitution, fees for being in jail, 'probation' fees and court costs, to JCS at the JCS office.

96.     This public ruse was maintained by JCS and Harpersville for purposes of imposing and collecting fines and costs from citizens such as the Plaintiff, and was accomplished by allowing JCS to control the money, determine how much each municipal court "offender" must pay each month, how much would be credited for each payment to the collection "services" of JCS each month, and how much it would rebate to Harpersville toward the fines adjudged.

97.     This policy of having a financially interested party, JCS,  acting as a probation officer violated due process since JCS had a personal, financial interest in conducting its collection efforts in a way that maximized profits and not as a neutral public court officer.

98.     In fact, once JCS was in charge of the collections JCS determined the minimum monthly amount it demanded from each 'probationer', the portion of collected funds that it remitted to the Town, the dates and times it required a person to travel to its office to pay, the threats and letters it would send to debtors, when it would request additional court hearings, and what information it would include in its request to revoke the person's 'probation'.

99.     The Town, the Town's judge Larry Ward, and JCS all had a financial interest in criminalizing these debtors to maximize revenue and thus when the Town outsourced to JCS the collection process, neither it nor its judge provided any oversight or

management of JCS' activities.

100.    The amount of the fine announced to debtors by the judge in open court often differed from the amount listed on the probation paperwork JCS filled out later as it did with Ms. Carden. The JCS papers regularly showed an amount higher than the fine and court costs set by Town ordinance and entered on the court order.

101.    Under its practice and scheme, Harpersville, which was also financially interested, took advantage of its control over its police force and jail facilities to deny these "offender"/debtors the statutory and constitutional protections that every other Alabama debtor may invoke against a private creditor by allowing JCS to threaten debtors of the Town with arrest and jail as coercion for payment.

102.    Under this scheme, it was the policy and practice of Harpersville to issue warrants by its magistrate and to arrest people through its police then jailing people when they could not afford to pay debts owed to the Town resulting from prior traffic tickets or fines and to do so without any inquiry into the person's ability to pay and without considering alternatives to imprisonment - all without providing the person adequate counsel.

103.    The treatment of Ms. Carden was caused by and was representative of the Town's policies and lengthy practices with JCS for collecting debts from the fines, fees, and costs assessed for traffic violations and other misdemeanor offenses committed within the jurisdiction of the Town.

104.    The Town's policy and practice was to assess fines, fees, and costs upon a conviction for a traffic violation or other misdemeanor offense.  If the person could afford to pay the total debt, s/he was permitted to pay, the case was closed, and the person was

free to go with no possibility of additional requirements or the threat of jail.  If the  person could not afford to immediately pay the total debt, the Town's agreement with JCS  was to put the person on a "payment plan" with JCS.

105.    Under its practice for many years, the Town's agent, JCS, set the terms of the payment plan.

106.    At the JCS 'revocation hearings' set by JCS, under the agreement with Harpersville JCS provided testimony against the offender. (Exhibit 1 p.1 ¶ G). The offender such as Ms. Carden was not provided notice of the petition nor any hearing on the petition. Nevertheless, the Town Magistrate issued baseless warrants with no findings, court directive or even allegations of willful failure to pay. (Exhibit 7)

107.    In this process, JCS gave the Town magistrate a list of names for the 'JCS docket' and produced 'petitions for revocations' to the Town court the morning of the hearing. The "Court" would then sign the petitions  ordering that a hearing date be set but as a matter of practice, no future hearing date was set with a warrant for arrest being promptly issued, as in Ms. Carden's case.

108.    If , as often happened, and happened in Ms. Carden's case - the person was not present in court on the date set by JCS, a warrant was issued for the person's arrest. When an arrest warrant was issued and executed, the Town added fees and costs to the debts already owed by the person, including a "warrant fee."

109.    When a person was brought into court after an arrest, the Town's policy and practice was to demand that they pay their  total debt - or  a significant  portion  of their debt- immediately or they would remain incarcerated in the Shelby County Jail. Once incarcerated,  the person was charged an additional $31.00 per  day for each day they

could not buy their freedom.

110.    The Town did not hire a public defender. As such, the poor people appearing in the city court had no meaningful representation. With its policy of not having a public defender Harpersville failed entirely to ensure that the procedures required by federal and Alabama law prior to incarcerating a person for nonpayment were followed.

111.    By failing to appoint adequate counsel, impoverished defendants were left without any meaningful opportunity to raise constitutional and statutory arguments and defenses against the experienced prosecutor who represented the Town in its court. Impoverished defendants were also effectively left alone to perform tasks that are difficult even for experienced attorneys. These tasks include, but are not limited to: (a) navigating the origin and determining the validity of the fines, fees, and costs assessed by the Town, a process that involves a complicated inquiry into the application of constitutional, state, and local law and an understanding of local practice and specialized terminology; and (b) making sense of the Town's complex and disorganized record-keeping - which was often deficient in material ways that become apparent only after careful examination - to determine whether the debts alleged by the Town are supported by the Town's accounting documents, receipts, and other records.

112.    The Town's policy and practice of failing to provide for public defenders at all stages of Municipal Court proceedings when combined with its court practice of allowing defendants to be convicted in absentia, without notice resulted in the vast majority of those individuals subsequently jailed for failing to pay their debts were without constitutionally adequate representation (or any representation at all) for the underlying traffic, misdemeanor, and 'revocation' proceedings in which the fines, fees, and additional costs

21

were assessed.

113.   These policies and practices created a culture of fear among the Town's poorest residents, who are afraid even to appear in the Town's court to explain their indigence and inability to pay because they knew they will be incarcerated by the Town without any meaningful process.

114.   The same fear motivated many very poor residents of the Town to sacrifice expenditures on food, clothing, utilities, home repairs, and other basic necessities of life in order to scrape together money to pay their debt to the Town.

115.   The Town's debt collection policies and practices with JCS also placed enormous pressure on family members - who have no legal obligation to pay any money to the Town - to come up with money to get their loved ones released from jail.

116.   Harpersville also used its police to arrest "offenders" and jail them for an undetermined period of time. The cash bond was set by the Town magistrate to approximate the money claimed to be owed from the person with none of the appropriate considerations for bail being involved. Unlike legitimate probation systems where a probationer would be entitled to a finding of the reasons for revocation, appointed counsel and, at worse, suffer jail time equating to the original sentence, the practice for many years at Harpersville, ignored all those safeguards.

**Count One**
**Defendants' Use of a Private Actor With a Personal Financial Stake in the Outcome of Judicial Proceedings Violated Plaintiff's Due Process Rights.**
**(JCS and Harpersville)**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

117.    The Due Process Clause of the Fourteenth Amendment prohibits neutral judicial officials and neutral civil and criminal law enforcement actors from having a personal financial interest in the cases prosecuted and decided by them in our legal system.

118.    The Town and Town's court, by and through its mayor, Theangelo Perkins, and city council, contracted with JCS a private, for-profit corporation to collect fines under the auspices of a traditional court function— probation—and, critically, made the resolution of the Plaintiff's cases contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of this private entity - JCS.

119.    In contrast to the traditional and longstanding role of the probation officer—such as the role performed by Alabama State Probation Officers and United States Probation Officers—JCS had a direct financial stake in every decision that they made regarding case supervision, enforcement, and revocation. JCS had a personal financial interest to conduct its role as a probation officer in a way that maximizes its personal profit and not as a neutral public court officer.

120.    Because this non-neutral actor, JCS, profited significantly from the decisions about what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what testimony to provide, and what sanction to recommend, there was a clear risk that those financial interests would affect its judgment when it made those decisions.

121.    Furthermore, the city and its hired judge were both tainted by significant financial interests in maximizing revenue from the court to support the city bond issue.

122.    There is also overwhelming evidence that these financial interests had an impact on every decision of JCS' employees. Because this private entity, JCS, had a significant personal financial interest in how these cases were managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, the collection process it administered violated the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

123.    The Town's agreement to allow JCS to provide testimony relating to 'probationers' enabled JCS to decide whether to initiate revocation proceedings and to decide what probation conditions it actively imposed. It could then make rules and determine whether and when to petition for revocation based on the perceived violation of those rules or other conditions. It also controlled how probationers were supervised and what information was provided to or withheld from them concerning their legal rights. Then, JCS served as the main witness or, as often happens, JCS' allegations were treated as evidence at any violation proceeding. Finally, JCS then recommended a resolution or sanction in the case. Those recommendations included whether the person should be placed back on probation for an extended period (and charged additional fees) and/or jailed.

124.    These collection practices by JCS and Harpersville without the benefit of adequate counsel, which the Town was required to provide, resulted in Ms. Carden being subjected to additional fees for JCS "services," being made the subject of a petition for revocation and having warrants issued for her arrest despite knowledge by both the city and JCS of her impoverished condition.

24

**Count Two**
**Denial of Due Process and Equal Protection**
**From Continued Pretrial Jailing and Denial of Counsel**
**While unable to Pay Preset Cash Bond**
**(Harpersville)**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

125.   The Fourteenth Amendment's due process and equal protection clauses have long prohibited keeping a person in jail because of the person's inability to make a monetary payment.

126.   Harpersville as a city establishing a city court was required to provide counsel for indigent defendants such as Ms. Carden.  This is a statutory obligation of the city- not its court and the city failed to meet this obligation.

127.   As a result, Ms. Carden's rights to due process and equal protection were violated when Penny Hall, the Harpersville city magistrate, acting pursuant to the city practice, issued warrants for Ms. Carden's arrest citing their only  basis unadjudicated traffic tickets none of which carry jail time.  These warrants were therefore facially invalid but were nonetheless used by the Harpersville police to support the arrest, detention and jailing of Ms. Carden.  Once Ms. Carden was in jail, Ms. Hall again acting without a legitimate basis for either the arrest warrant or detention conditioned Ms. Carden's release on payment of a cash bond in an amount set to approximate fines which had not yet been adjudicated.

128.   Ms. Hall issued warrants for Ms. Carden's arrest based only on traffic tickets and knew at that time that no finding of guilt even on those tickets had been made and the city fine schedule did not provide for jail time on those charges.

129.    Even before Ms. Carden's arrest, pursuant to the practice at Harpersville, Ms. Hall set a cash bond amount closely approximating anticipated fines for the unadjudicated traffic tickets.  After the arrest, and after being specifically aware that Ms. Carden had could not buy her freedom by posting the cash bond Hall demanded, neither she nor any other city employee took any steps to provide Ms. Carden with adequate counsel while she was jailed.  Further, neither Ms. Hall nor any other city employee made inquiry into Ms. Carden's indigence and inability to pay, nor was any assessment of alternatives to detention performed to determine whether the Ms. Carden was a danger to the community or a flight risk.

130.    As such, Ms. Carden was forced to spend nineteen (19) days in jail before any court appearance, plea or adjudication of the traffic tickets.  Only then was Ms. Carden brought to the city court and only found guilty of three (3) traffic violations whereupon she was sentenced to pay only fines that totaled $967.00 with no jail. Even that adjudicated amount which was several hundred dollars less than the cash bond of $1434 demanded after her arrest by Hall for her release.

131.    This practice implement at Harpersville is also shown by the other eight (8) inmates that appeared in the city court with Ms. Carden who were also denied counsel while being unable to pay the preset cash payment demanded by Ms. Hall for their release.

132.    These due process and equal protection violations went unchecked because Harpersville did not provide counsel to these impoverished people as required by state and federal law. As such, Ms. Carden was harmed by having her freedom unlawfully taken from her as well as her personal dignity.

**Count Three**
**Denial of Due Process**
**Ms. Carden Had a Right to a Revocation Hearing**
**Defendants Requested and Issued**
**Arrest Warrants with no hearing as Ordered by the Court**

**(JCS and Harpersville)**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

133.    Ms. Carden was assigned to JCS "probation" and on September 9, 2010, JCS petitioned the Harpersville city court to revoke Ms. Carden's 'probation'. In this petition submitted by JCS, the city judge ordered that a hearing be set for the petition and that Ms. Carden given notice:

<u>ORDER</u>

It appears to the Court that a Petition for Revocation of Probation and Statement of Delinquency Charges having been filed in the Harpersville Municipal Court, a copy of which is attached hereto and incorporated herein by reference, and **the Court having reviewed said Petition, is of the opinion that a hearing should be held to determine whether or not the Defendant-Probationer is in violation of the terms of her probation as charged in said Petition.**

**NOW, THEREFORE IT IS ORDERED, ADJUDGED AND DECREED that a Revocation Hearing be set** before this Court to determine if the  Defendant-Probationer has violated the terms of her probation and as a result should, therefore, have the period of her probationary sentence revoked and the original sentence of the Court imposed.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED that a true copy of this Petition, together with the conditions of probation and all other relevant documents be served upon the above named Defendant. Consider this order suspending time on this case until a resolution is decided.**

(Exhibit 7)**(emphasis added)**

134.    Larry Ward signed his name under this Order section and it is dated September 9, 2010.

135.   No future hearing on the petition was set or conducted and neither JCS nor the City attempted to schedule this hearing or deliver this petition as ordered by this signed petition.

136.   Instead, on the next day September 10, 2010, JCS updated its records showing a warrant was issued on September 10, 2010. (Exhibit 8 p. 2)

137.   The policy and practice of the Town and JCS was to immediately issue a warrant for a person's arrest immediately even though the judge only ordered that a hearing be scheduled and that the petition be delivered to the 'probationer'.  Warrants were issued by the Harpersville Magistrate Ms. Penny Hall and had no legitimate basis under this practice since there was no order revoking "probation" much less any hearing or findings on the petition of JCS.

138.   Since neither JCS nor the city magistrate nor the city prosecutor or anyone else at the Town attempted to deliver the signed Petition and related documents to Ms. Carden or schedule a hearing, Ms. Carden never had notice of the petition nor any hearing or an ability to contest any allegations against her prior to issuance of the warrant.

139.   Due process requires that a person know of the allegations against him/her and substantive due process requires that a person have an opportunity to be heard and contest the charges in open court. Under the policy and practice of JCS with the Town of Harpersville , these due process requirements were not provided.

140.   Alabama law consistent with the constitution requires that revocations for probations include  a hearing, with appointed counsel if jail is in jeopardy with the judge entering detailed, written findings if probation is to be revoked.

141.   None of those constitutional requirements were provided to Ms. Carden at

Harpersville since it was the practice there for JCS to request arrest warrants and for the town magistrate to issue warrants once the judge merely signed an order that hearing be held.

142.   Ms. Carden's procedural and substantive due process were violated by the joint practice of JCS and the Town in issuing warrants under these facts and was injured by being subject to arrest despite no hearing or opportunity to contest the allegations against her.

**Count Four**
**Denial of Due Process - Harpersville**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

143.   By its contract, Harpersville delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

144.   The contract between JCS and the Town of Harpersville grants an exclusive franchise for provision of private "probation" services at Harpersville, but was not competitively bid, as required by Ala. Const. Art. I, § 22 and Ala. Code 1975, §41-16-50.

145.   That no bid contract gave JCS an exclusive contract and was signed by the Town mayor and bound Harpersville and its municipal court:  "***court agrees that each court order shall provide*** for the following:

a probation fee of $35.00 per month flat fee

One time probationer set up fee of $10.00. . . . " (***emphasis added***).

146.   Harpersville, through its mayor and/or council, approved the agreements with JCS and signed the contract on March 3, 2005.

147.    Harpersville, through its mayor and council, also approved the employment of Larry Ward as a part time judge of its municipal court.

148.    Municipalities are prohibited from laws, ordinances and policies which are in conflict with state law.  *See Ala Code* Section 11-45-1.  *Also see, Ala. Const.* Article 4, Section 89.

149.   State law also dictates a separation of the branches of government.  *Ala Const.* Article 3, Section 43.[2]  Under that doctrine, legislative powers granted to cities and towns are exercised by the Town council, *Ala. Code,* Section 11-43-43, while the mayor of the Town is responsible for executive duties.  *Ala. Code,* Section 11-43-83.  If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama.  *Ala. Code,* Section 12-2-7 *et. seq*.; *Ala Const.,* Article 6, Section 139.

150.    Municipal mayors have the executive power to execute and enforce contracts[3] and the Town councils have the legislative power to enact regulations and ordinances,[4] but neither the mayor nor the council has the power to invade the administration of its judiciary.

_____

[2]Ala. Const. Art. III, Section 43 states:
In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.

[3]Ala. Code Section 11-43-83 - The mayor shall see that all contracts with the town or Town are faithfully kept or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf of the Town or town and no sureties shall be required on such bond. He shall perform such other executive duties, in addition to those prescribed in this article, as may be required of him by the council.

[4]Ala. Code Section 11-43-43 - All legislative powers and other powers granted to cities and towns shall be exercised by the council, except those powers conferred on some officers by law or ordinance. The council shall perform the duties required by this title and other applicable provisions of law.

151.    Harpersville has exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, it agreed with JCS to bind its municipal court to include probation and fees for JCS in every court order entered by its hired judge.  Those fees are not part of any fine schedule or allowed court costs. As such, that action essentially sold the court process for purposes of increasing income to the Town and its agent JCS.

152.    The illegal agreement and policy of Harpersville invaded the judicial authority and court administration reserved to the municipal judge and the Chief Justice.  Further, even the municipal court lacks jurisdiction to add monthly fees not part of any schedule of fine established by ordinance, and not part of the costs allowed by statutes.

153.    Probation is only appropriate when an individual has been sentenced to jail time and not when only a fine has been assessed as is the case with Ms. Carden.  As a result, the Harpersville policy and contract to include probation in every court order mandated a practice that continually deprived impoverished misdemeanants of their constitutional rights.

154.    The policy and practice of Harpersville also violated the Alabama Constitution.  Article I, Section 20 *Ala. Const.* specifically prohibits imprisonment for the payment of debts, yet the policy enforced at Harpersville through its magistrate and police regularly jailed misdemeanants upon the recommendation of its agent JCS for failure to pay fines, fees and costs.  Article I, Section 16 *Ala. Const.* requires that all persons shall before conviction be bailable by sufficient surety, but despite this prohibition, misdemeanants were regularly jailed without any lawful conviction under any contempt proceedings or probation violation with bail set by the Magistrate at the amounts claimed

to be owed to include jail fees never ordered by the court.

155.   The Plaintiff was jailed on unadjudicated traffic tickets and was not given a hearing or consideration of her indigency before being jailed.

156.   At the Harpersville Municipal Court, a person unable to fully pay fines and costs when levied was automatically placed on JCS "probation."  The Harpersville system used the JCS orders and forms even when there is no jail sentence adjudicated.  This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fines and costs.  The orders supplied by JCS under the agreement with Harpersville then required the individual to make payments to JCS, rather than the Town clerk, of the fines, costs and additional monthly fees.

157.   Harpersville, through its Town clerks, actively enforced these requirements as part of the policy and procedures established under this contract and refused to accept payments of fines and costs at the Town clerk's office and instead directed those persons to make all payments, including those for fines, restitution, probation fees and court costs, to JCS at the JCS office at hours and locations set by JCS.

158.   Harpersville, through its contract, practice and policy, clothed its agent JCS with the appearance of state authority and has previously allowed JCS employees to carry badges.  Under these practices and policies, JCS employees were allowed to attend each municipal court session and were referred to "probation officers" in the operation of the municipal court and Town clerk's office, though none had such authority under Alabama statutes.

159.   Harpersville's policy and practice also allowed JCS to control the money collected from persons such as Ms. Carden and to determine how much each such

municipal court "offender" must pay each month.

160.    Harpersville's policy and practice also allowed JCS to determine how much of the collected sums will be credited to the collection "services" of JCS each month and how much it would rebate to Harpersville toward the municipal court fines adjudged.

161.    This system, as a matter of routine, violated the rights of persons such as the Ms. Carden by imposing fines and charging fees to impoverished persons with no hearing or consideration of their indigency.

162.    Despite the lack of authority to do so, Harpersville's practice and policy permitted and approved JCS in its collection efforts and at its discretion, to use threats of revoking probation, increasing fines and costs, arrest and jail time for purposes of collection.

163.    Under this practice for many years at Harpersville, JCS was permitted and approved in setting payments and reporting schedules and determining when the individual's "probation" should be revoked, or when to impose additional fines and costs.

164.    Under the system operated at Harpersville, JCS's determination to incarcerate an individual and/or impose unreasonable release requirements was routinely accepted by Town magistrate and police without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency or appointment of counsel before taking such punitive action.

165.    Harpersville by practice permitted JCS to control and dictate these functions and, as a consequence, this routinely resulted in court costs and fines which exceed the statutory maximum of $500 for municipal courts.  Additionally, Harpersville imposed additional "jail fees" of $31 per day determined by the Town clerk for the costs of any

incarceration.

166.   The part time municipal court judge employed by Harpersville did no investigation of indigency as a matter of policy and has testified that he thought that was the duty of JCS which also did not investigation of indigency.

167.   Under the system at Harpersville, after simple fines were illegally converted to "probation" for payment, arrest warrants and jail often resulted for the "offender" who did not meet the payment schedule set by JCS and enforced by Harpersville.  This system used and accepted JCS's conclusion of a "probation violation" and employed JCS recommendations for the issuance of a warrant of arrest to incarcerate individuals whose original obligation was only the payment of a fine.  After the issuance of a warrant, the Town used its police force to arrest and jail these individuals.

168.   Harpersville adopted and implemented JCS' process of issuing arrest warrants through its magistrate  to incarcerate individuals like Ms. Carden when the JCS petition for revocation was only ordered to be set for a hearing resulting in no notice or hearing on the petitions.

169.   In this process of converting fines to jail time, Harpersville through its magistrate and court did not give adequate notice to the "offender" of the nature of any lawful charge, and its court failed to conduct hearings, failed to make written findings concerning the reasons for any probation revocation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

170.   Under this policy and practice at Harpersville, when a simple fine was transformed into jeopardy of a jail sentence, the Town failed to provide counsel for the

"offenders."

171.    As a proximate consequence of this deprivation of due process, Ms. Carden suffered injuries, being unlawfully incarcerated before any adjudication with the loss of her liberty and by having other illegal charges for JCS fees, costs and restitution levied, all while being impoverished.

**Count Five**
**Denial of Due Process - JCS**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

172.    The Plaintiff avers that JCS, acting under color of state law in violation of 42 U.S.C. § 1983, has denied her right to due process and has done so in concert and by agreement conspiring with Harpersville.

173.    JCS operates a "for profit" enterprise that markets its services to various municipal and county governments and contracted with over 100 cities and towns throughout Alabama including Harpersville. JCS' marketing approach to these cities emphasized that its fees would be paid by the "offender" before the municipal court and that its efforts will improve collection of court fines and costs at no cost to the Town.

174.    JCS routinely uses a form contract to establish its relationship with its customer cities and similarly trained its employees using a training manual replete with forms for court use and for contacting the "offenders" from whom it is seeking collection.

175.    Under the system established by JCS, its employees are not required to have criminal justice or legal training, nor are they required to have any social work education or meet any minimum law enforcement standards as is required of state probation officers. Instead, JCS requires only that its employees be 21 years old, a non felon, with two years

of college who complete 40 hours of training by JCS on its processes.  On satisfying those requirements, JCS employees are then labeled "Probation Officers" and permitted to carry the JCS issued badge in collecting its fees, court fines and costs.

176.    Under this system and by agreement with Harpersville, many administrative and judicial functions of Harpersville's municipal court were unlawfully delegated to JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

177.    The agreement drafted by JCS and signed by the Harpersville mayor and JCS attests that the Harpersville municipal "*court agrees that each court order shall provide* for the following:

> a probation fee of $35.00 per month flat fee
>
> One time probationer set up fee of $10.00. . . . " (*emphasis added*).

178.    JCS was, by virtue of this contract with Harpersville, clothed with the appearance of a state actor and its actions were inextricably interwoven with those of Harpersville with which it conspired and acted in concert.  Under its contract and its operations with Harpersville, JCS employees represented itself to Ms. Carden as "probation officers" acting as agent "on behalf of Town of Harpersville."

179.    The JCS system at Harpersville provided "Order of Probation" forms to the municipal court with the printed requirement on each form that the "offender" pay JCS $35 per month plus $10 for a file set up charge. The monthly fee of $35 was later increased to $45 per month for each "offender" at Harpersville. The orders supplied by JCS required the individual to make payments to JCS of the fines, costs and additional monthly fees as required under its contract with the Town.

180.    Under the JCS contract and procedures, the resulting policy and practice at

Harpersville's municipal court automatically required "probation" for any person who, despite having no jail sentence, was unable to fully pay the fine and costs when levied by the municipal court.

181.    The Plaintiff was placed on "probation" with JCS under this practice despite the fact that she had not been sentenced to any jail time.

182.    That "probation" under agreement between JCS and Harpersville, was required to be part of every printed order at Harpersville's municipal court and also required payment of monthly fees to JCS.

183.    The policy and practice method of JCS, after requiring probation orders for those unable to immediately pay their fines, and adding additional, monthly fees for JCS, also requested incarceration for a failure to pay fines, fees and costs when payment was not forthcoming as JCS demanded.

184.    Incarceration of individuals who could not pay their fines and added fees, such as Ms. Carden, was accomplished by JCS leveling charges against them to revoke their "probation" without a revocation hearing being scheduled. Rather, once a judge issued an order to schedule a revocation hearing, JCS and the city cooperated by its magistrate immediately issuing a warrant for the person's arrest.

185.    Though a determination of willful refusal to obey a court order as required by *Ala. Code* §15-18-62 can lawfully lead to incarceration, no such determinations were made under the JCS system and Harpersville's policy nor was any there any claim of willful failure to pay made against Ms. Carden when a warrant was issued for her arrest.

186.    JCS expressly denies any responsibility to determine indigency of the "offenders" such as the Plaintiff or to determine any reasons for an inability to pay the fine.

Therefore, when an "offender" like Ms. Carden is unable to pay the fine and additional fees required by JCS, JCS and Harpersville cooperated with each other to issue arrest warrants requested by JCS in its petitions for revocation.

187.    Ms. Carden was impoverished at the time the traffic fines were levied against her in Harpersville. Her indigency was evidenced by the fact that she could not pay the cash bond Harpersville demanded for her release from jail. Ms. Carden continued to be unable to pay the fines and fees demanded by JCS due to her poverty and a warrant for her arrest was issued by the city magistrate based upon JCS's recommendation to its conspirator Harpersville with no court finding on its petition for revocation.

188.    The incarceration process used by JCS includes the use of JCS drafted forms that it sent to "probationers" and JCS forms it used to request that a person be jailed.

189.     The JCS system and its "Probation Tracker" software is highly systemized and focuses on collections of fines and its fees -- not traditional probation services. That collection focus allows the "offenders" to mail in payments if they live 30 miles from the JCS office. *See* Doc. 1-5. The training manual used by JCS instructs its employees on the use of its computer systems in tracking the payments made by the "offenders" and provides court forms to order probation and payments to JCS. The JCS training system also provided sample letters for use after probation was ordered, threatening the "offender" that "a warrant will be issued for your arrest" and that their "court date cannot and will not be reset." *See* Docs. 1-6 and 1-7.  Similar JCS forms instructed the "offender" that they could avoid the court date if they paid an amount determined by JCS.  *See* Doc 1-8. Notice to the offender of these JCS set "court dates" was, with the Town's knowledge, handled by JCS by regular mail with no proof of service and no consideration of returned

mail showing no receipt. Similarly, the setting for any hearing on petitions instituted by JCS was done by JCS and listed on a separate "JCS Docket" which JCS established and which Harpersville then adopted. Finally, the JCS manual instructs its employees on the issuance of warrants of arrest and provides forms for that purpose.  *See* Doc.1-9.

190.   The agreement and forms drafted by JCS are uniformly used by it and were used at Harpersville.

191.   Clothing JCS with the color of state law and authority was purposely structured under the JCS system for it to extort and collect its fees, fines and costs from citizens such as the Plaintiff, and is accomplished by providing JCS control over the money collected, the payment amount required, schedule of appointments, the location where the money must be paid  and control over how much will be credited for each payment to the collection "services" of JCS each month as opposed to how much of it would be rebated to Harpersville toward the fines adjudged.

192.   Despite the lack of authority to do so but in concert with Harpersville, JCS, at its discretion, used threats of revoking probation, increased fines and costs and jail time for purposes of collection.  Under this system, when an individual like Ms. Carden failed to pay to the satisfaction of JCS, JCS would determine that the individual's "probation" should be revoked.  Under the system operated jointly by Harpersville and JCS, JCS' determination to incarcerate an individual like Ms. Carden was routinely accepted as it was with Carden, without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency or appointment of counsel before taking such punitive action.

193.   The actions and efforts of JCS routinely resulted in court costs, fines and fees

which exceed the jurisdictional maximum of $500 for municipal courts. .

194.    This system at Harpersville used JCS' conclusion of a "probation violation" and employed JCS recommendation for the issuance of warrants by the magistrate to arrest individuals like Ms. Carden whose original case had only been a fine.

195.    In this process of converting fines to jail time, JCS and neither Harpersville nor its court personnel gave adequate notice of the nature of any lawful charge, and failed to conduct hearings, failed to make written findings concerning the reasons for revoking probation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

196.    Under this joint policy and practice of JCS and Harpersville, when a simple fine was transformed into jeopardy of a jail sentence, neither JCS nor Harpersville took steps to provide counsel for the "offenders."

197.    As a proximate consequence of this deprivation of due process, Ms. Carden suffered injuries including being unlawfully incarcerated on unadjudicated traffic tickets with the loss of her liberty and injury to her dignity, by having other illegal charges for JCS fees, costs levied against her and being subjected to further arrest - all while being impoverished.

**Count Six**
**Denial of Equal Protection - Harpersville**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

198.    Harpersville has acted under color of state law in violation of 42 U.S.C. § 1983 to deny the Plaintiff's rights to equal protection secured by the Fourteenth

Amendment and in concert and agreement conspiring with JCS.

199.    This was accomplished by the illegal contractual agreement with JCS approved by the Harpersville mayor and council. Under that agreement, the actions of its agent JCS were inextricably intertwined in a practice and policy at Harpersville and its court. That practice and policy automatically required "probation" for any person who, despite having no jail sentence, was financially unable to fully pay the fine and costs when levied by the municipal court.  That probation requirement was part of the agreement between Harpersville, its court  and JCS and was part of every printed order at the municipal court and required payment of monthly fees to JCS.

200.    Persons who were financially able to fully pay the levied fine and costs at Harpersville were not placed on "probation."  As a result, those persons were not charged any fees for JCS and were not subjected to threats of arrest, extortion and incarceration in the collection process.

201.    For those such as the Plaintiff who were unable to fully pay the fine and costs when levied, they were charged fees for JCS and also charged jail fees for every day they spent in jail.

202.    This "probation" requirement was part of the Harpersville contract with JCS. That contract, as mentioned above, exceeds the statutory and constitutional authority of municipalities and imposed on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government.

203.    Once on "probation" for purposes of paying fines and costs, this policy and practice at Harpersville and its court routinely imposed incarceration and additional costs on individuals who were unable to pay fines and costs, without any determination of

willfulness as would lawfully be required under Alabama statutes.  See *Ala Code* Section 15-18-62.

204.   This disparate treatment based upon the wealth of the "offender" is a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

205.   This inequality of treatment is also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  *See Ala. Code* Section 12-14-8.  The practice imposed under this contract at the Harpersville court was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders" who could not pay immediately and created its own "rules" for penalizing individuals who could not pay as directed.

206.   These additional JCS fees imposed by the Harpersville contract resulted in disparate treatment between those who could immediately pay the fine from those who were unable to immediately pay the fine. Furthermore, those "offenders" at the Harpersville court with its JCS arrangement were processed and fined differently than "offenders" in jurisdictions that have not allowed JCS to charge additional fees to those who cannot pay. There is no state authority for such disparate treatment.

207.   The Plaintiff was required to pay the additional costs and fees under this disparate system and a warrant for her arrest was issued for her inability to pay as demanded.

208.   As a proximate consequence of this denial of the right to equal protection under the Fourteenth Amendment, the Plaintiff suffered injuries, including being subject to arrest and by having other illegal charges for JCS fees, costs and jail fees demanded

for the time the Town kept her in jail -- all while being impoverished.

**Count Seven**
**Denial of Equal Protection - JCS**

Plaintiff incorporates by reference the previous paragraphs and make them a part

hereof.

209.    JCS and Harpersville have acted jointly under color of state law in violation

of 42 U.S.C. § 1983, to deny the Plaintiff rights to equal protection secured by the

Fourteenth Amendment and have done so in concert and by agreement conspiring with

each other.

210.    JCS, though a private company, has been clothed with the color of state law

by the specific actions of Harpersville all pursuant to an agreement between these parties.

211.    As referenced above, by agreement, JCS employees attended all municipal

court sessions, used the mayor's office, collected Town fines and costs, were labeled as

"probation officers," carried badges and regularly represented themselves as acting "on

behalf of the Town of Harpersville." Additionally, the JCS forms were used at the municipal

court and fees for JCS were included in every court order there.

212.    In the system established by an illegal agreement between JCS and

Harpersville, the actions of JCS were inextricably intertwined with those of its conspirator

Harpersville.

213.    The practice and policy under this agreement automatically required

"probation" for any person like Ms. Carden who, despite having no jail sentence, was

financially unable to fully pay the fine and costs when levied by the municipal court.  That

probation requirement was part of the agreement between JCS and Harpersville and was

a required part of every printed order at the municipal court and required payment of

monthly fees from Ms. Carden to JCS.

214.   Persons who were financially able to fully pay the levied fine and costs at Harpersville were not placed on "probation."   As a result, those persons were not charged any fees for JCS and were not subjected to threats of arrest and incarceration in the collection process.

215.   This requirement on its municipal court was part of the Town contract with JCS.   That contract, though signed by the mayor and council, as discussed above, exceeded the statutory and constitutional authority of municipalities and imposed on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government as embodied in the Alabama Constitution.   *Ala. Const,* Article 3, Section 43.

216.   Once on "probation" for purposes of paying a fines and costs, this JCS policy and practice at Harpersville routinely requested incarceration and additional costs on individuals who were unable to pay fines and costs, without any allegation or determination of willfulness as lawfully required under Alabama statutes.   See *Ala Code,* Section 15-18-62.

217.   This disparate treatment based upon the wealth of the "offender" before the municipal court was a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

218.   This inequality of treatment was also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.   *See Ala. Code* Section 12-14-8.   The JCS system at Harpersville was not uniform with the procedures

established by the Alabama Administrative Office of Courts because it added fees only to "offenders" like Ms. Carden who could not pay immediately and created its own "rules" for penalizing individuals who could not pay as directed.

219.    These additional JCS fees resulted in disparate treatment between those who could immediately pay the fine from those who, like Ms. Carden, were unable to immediately pay the fine. Furthermore, those "offenders" within the Harpersville/JCS arrangement were processed and fined differently than "offenders" in jurisdictions that have not allowed JCS to charge additional fees to those who cannot pay. There is no state authority for such disparate treatment.

220.    The Plaintiff was required to pay the additional costs and fees under this disparate system. An arrest warrant was then issued when she could not pay as demanded.

221.    As a proximate consequence of this denial of the right to Equal Protection under the Fourteenth Amendment, the Plaintiff suffered injuries including by illegal charges for JCS fees, costs and restitution levied against her and being subjected to arrest warrants for her failure to pay all while being impoverished.

### Count Eight
### DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

222.    A real controversy exists between these parties concerning several issues, including the validity of Harpersville's attempt to bind its municipal court and the legality of the actions taken under the contract with JCS, such that declaratory relief is appropriate.

223.    Plaintiff requests the Court to declare that Harpersville had no authority to

contractually bind its municipal court and that the contract is void *ab initio*.

**The contract violates Due Process by Placing a Financially Interested Party as a Probation Officer**

224.    The Due Process Clause of the Fourteenth Amendment prohibits neutral judicial officials and neutral civil and criminal law enforcement actors from having a personal financial interest in the cases prosecuted and decided by them in our legal system.

225.    The Town and Town's court contracted with JCS, a private, for-profit corporation to collect fines and cost under the role of a traditional court function—probation—and, critically, made the resolution of the Plaintiff's cases contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of this private entity.

226.    In contrast to the traditional and longstanding role of the probation officer—such as the role performed by Alabama State Probation Officers and United States Probation Officers—JCS had a direct financial stake in every decision that they made regarding case supervision, enforcement, and revocation. JCS had a personal financial interest to conduct its role in this "probation" in a way that maximizes its personal profit and not as a neutral public court officer.

227.    Because this non-neutral actor profited significantly from the decisions about what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what testimony to provide, and what sanction to recommend, there was a clear risk that those financial interests would affect its judgment when it made those decisions.

228.    There is also overwhelming evidence that these financial interests had an

46

impact on every decision of JCS' employees. Because this private entity had a significant personal financial interest in how these cases are managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, the policies and practices of JCS and the Town violate the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

229.    Pursuant to the contract with the Town and the Town's Court JCS could not only decide whether to initiate revocation proceedings, but it also influenced what conditions are imposed. It then made its own rules and determined whether and when to petition for revocation based on the perceived violation of those rules or other conditions. It also controlled how probationers were supervised and what information was provided to or withheld from them concerning their legal rights. Then, JCS served as the main witness or, as often happens, JCS' allegations were treated as evidence at any violation proceeding. Finally, JCS then recommended a resolution or sanction in the case. Those recommendations included whether the person should be placed back on probation for an extended period (and charged additional fees) and/or jailed.

230.    This agreement to place a financially interested party in a position that is suppose to be performed by a neutral official violated the due process clause of the Fourteenth Amendment and was contrary to public policy. As such, the contract is void *ab initio*.

### The Town does not have the power to bind the Court

231.    Harpersville entered into an agreement with JCS that exceeded both its statutory and constitutional limitations on municipalities.  Furthermore, that agreement violated the separation of powers doctrine embodied in the Alabama Constitution.  See *Ala.*

*Const.,* Article 3, Section 43.   As a result, that agreement is void and due to be declared a nullity.

232.    Alabama state law also dictates a separation of the branches of government. *Ala. Const.,* Article 3, Section 43.   Under that doctrine, legislative powers granted to cities and towns are exercised by the Town council, *Ala. Code* Section 11-43-43, while the mayor of the Town is responsible for executive duties.  *Ala. Code,* Section 11-43-83.  If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama.  *Ala. Code* Section 12-2-7 *et. seq*.; *Ala. Const.,* Art. 6, Section 139.

233.    A Town's mayor, such as Harpersville's mayor, has the executive power to execute and enforce contracts and the Town council has the legislative power to enact regulations and ordinances, but neither the mayor nor the council has the power to invade the administration of its judiciary.

234.    Harpersville exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, it agreed to require its municipal court to include probation and fees for JCS in every court order entered by its hired judge.  That action essentially sold the court process for purposes of increasing income to the Town.

### Contract violates statutory limitation regarding traffic citations and municipal fines

235.    That agreement also violated the uniformity required by statute for processing traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  *See Ala. Code* Section 12-14-8.

236.    The process at Harpersville was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders"

who could not pay immediately and created other "rules" for further penalizing individuals who could not pay as directed.  "Offenders" who were able to immediately pay the fine were charged one rate, but those who were unable to immediately pay for the same offense were charged the fine and required to pay JCS monthly fees that accumulate each month that passed.

237.   The "offenders" at Harpersville were processed and fined differently than "offenders" in municipal jurisdictions which did not contract with JCS to charge its fees to those who cannot pay and, as a result, violates uniformity requirements of *Ala. Code* Section 12-14-8.

### Contract overrides judicial authority and administration of municipal courts reserved to the Chief Justice

238.   The illegal agreement and policy of Harpersville invaded and overrode the judicial authority and court administration reserved to the municipal judge and the Chief Justice.

### Contract is an exclusive franchise

239.   The contract between JCS and the Town of Harpersville granted JCS an exclusive franchise for the collection of Town fines and court costs. According to their contract the collection activities were described as "probation" and JCS was the Town's sole provider of these services up and until the Town council terminated its contract on August 8, 2012.

240.   The contract was not competitively bid as required by Ala. Const. Art. I, § 22 and Ala. Code 1975, §41-16-50.

241.   Because the contract was not bid, it is void.

242.   The Plaintiff also requests the Court to declare the actions of Harpersville

under this contract to be void *ab initio* under the premises discussed above.  Under this void agreement, Harpersville implemented policies and practices to prosecute and extort persons such as the Plaintiff where there is no jurisdiction or authority to do so under Alabama law, doing so intentionally in an effort to coerce payment of fines and costs from impoverished people.   These efforts have resulted in the illegal prosecution and incarceration of the Plaintiff beyond the limited jurisdiction of the municipal courts.

243.   Further, the practice at Harpersville under this contract  added increased punishment, fines and costs after adjudication and even where there has been no adjudication of guilt, all without jurisdiction or authority for such under Alabama law.  By adding old fines to current "probation" orders  and adding charges for time spent in jail against their will, Harpersville violated the prohibition against ex post facto punishments.

244.   The Plaintiff requests the Court to enjoin the actions of Harpersville identified herein to prevent the resumption of these violations of statutory and constitutional prohibitions.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that the Court will take jurisdiction of this cause and upon the final hearing shall declare the contract between JCS and Harpersville to be void *ab initio*, and order restitution from the parties, and award the Plaintiff such damages as this Court shall find the Plaintiff has sustained, together with punitive, treble or exemplary damages as the law shall permit

### JURY DEMAND

Plaintiff demands a trial struck by jury.

RESPECTFULLY SUBMITTED,

s/ *G. Daniel Evans*

G. Daniel Evans
ASB-1661-N76G
Attorney for The Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com

s/ *Alexandria Parrish*
Attorney for The Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: ap@evanslawpc.com

s/ *Maurine C. Evans*
Maurine C. Evans
ASB-4168-P16T
Attorney for The Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: me@evanslawpc.com

s/ *William M. Dawson*
William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209
Telephone: 205-795-3512
E-Mail: bill@billdawsonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2017, I electronically filed the foregoing Plaintiffs'
Second Amended and Restated Complaint with the Clerk of the Court using the CM/ECF
system, which will send notification of such filing to:

L. Conrad Anderson IV
Gregory C. Cook
Will Hill Tankersley
Ginny Willcox Leavens
Balch & Bingham, LLP
1901 6th Avenue North
P.O. Box 306
Birmingham, AL 35201

Larry S. Logsdon
Michael L. Jackson
Wesley K. Winborn
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
P.O. Box 530910
Birmingham, AL 35253

F. Lane Finch, Jr.
Brian C. Richardson
SWIFT CURRIE MCGHEE & HIERS, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203

Wilson F. Green
Fleenor & Green LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, Alabama 35406

s/ *G. Daniel Evans*
G. Daniel Evans
